**Raymond G. DASSERO, et al., Plaintiffs,**

v.

**Charles E. EDWARDS, et al., Defendants.**

**No. 01–CV–6269L.**

United States District Court, W.D. New York.

Feb. 12, 2002.

Warren B. Rosenbaum, Shapiro, Rosenbaum, Liebschutz & Nelson, LLP, Rochester, NY, for Plaintiffs.

Jeffrey S. Lichtman, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Metlife Securities, Inc. and Metropolitan Life Ins. Co.

Paul J. Yesawich, III, Harris Beach, LLP, Pittsford, NY, Michael K. Wolensky, Ethan H. Cohen, Atlanta, GA, for Charles E. Edwards.

*DECISION AND ORDER*

LARIMER, Chief Judge.

## INTRODUCTION

This is an action under the federal securities fraud laws, commenced on May 29, 2001 by eight individual plaintiffs against defendant Charles E. Edwards and four other defendants. Plaintiffs' claims arise out of the sale by ETS Payphones, Inc. (a Georgia corporation, now in bankruptcy, of which Edwards was the President and Chief Executive Officer ("CEO")) to plaintiffs of customer-owned coin-operated telephones ("COCOTs"). In general, plaintiffs paid $7000 for each COCOT unit, and ETS agreed to lease the telephone back for a fixed fee, and to maintain and operate the COCOT. The COCOTs, including the site leases, lease-back and other agreements, are alleged to have constituted investment contracts, and therefore "securities" within the meaning of § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). Plaintiffs allege that because ETS's revenues from payphone operations were never enough to cover its operating expenses, ETS had to attract an ever-growing number of new investors in order to meet its obligations to existing investors. In short, ETS's "investment" offer was allegedly nothing more than a Ponzi scheme.

On September 26, 2001, pursuant to stipulation, plaintiffs' claims against two of the defendants were dismissed. On October 19, 2001, plaintiffs filed an amended complaint asserting claims against Edwards only, thus leaving Edwards as the only defendant in this action.

On October 18, 2001, Edwards filed a motion to compel arbitration and to stay these proceedings pending arbitration ("the arbitration motion"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C.

§§ 3 and 4.[1]

Defendant's motion is based on an arbitration clause contained in the "Telephone Equipment Lease Agreement" ("the Agreement") between ETS and each plaintiff concerning the sale and leasing of COCOTs. Paragraph 22(a)[2] of the Agreement states:

DISPUTE. Any dispute, controversy, or claim of whatever nature (except an interlocutory hearing for an action for a temporary restraining order, preliminary injunction, or similar equitable relief) asserted by any party against another party arising out of, or relating to, this Agreement or the breach hereof, shall be settled by arbitration, if requested, by any party pursuant to this Section 21.[3] The arbitration shall be conducted by one (1) arbitrator, who shall be appointed pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). The arbitration shall be held in Atlanta, Georgia, and shall be conducted in accordance with the Commercial Arbitration Rules of the AAA, except that the rules set forth in this Section 21 shall govern such arbitration to the extent that they conflict with the rules of the AAA.

Arbitration Motion, Ex. 1. An almost identically worded provision is located at § 7(a) of the Option to Sell Agreement attached to, and incorporated by reference in, the Agreement, governing plaintiffs' rights to require ETS to purchase the COCOT equipment prior to or upon termination of the Agreement.

## DISCUSSION

### I. Edwards's Status as a Nonparty to the Agreement

In opposition to the arbitration motion, plaintiffs contend that Edwards cannot seek to enforce the arbitration clause because he is not a party to the Agreement containing the clause. The Agreement states that it is "by and between ETS Payphones, Inc." and each plaintiff. Although Edwards did sign each Agreement, he did so on behalf of ETS. Plaintiffs contend that because the Agreement provides for arbitration of any claim "asserted by any party against another party ... if requested, by any party," Edwards, a nonparty to the Agreement, cannot demand arbitration of the instant dispute.

Plaintiffs contend that as a general rule, a non-signatory to an agreement cannot enforce the agreement's arbitration clause. A review of the case law in this area, however, reveals that there are a number of different situations in which a non-sig-

---

1. In addition, on August 21, 2001, Edwards moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure various substantive grounds. By letter to the court dated October 31, 2001, Edwards's attorney stated, *inter alia,* that plaintiffs' filing of the amended complaint "moots Mr. Edwards's previously filed Motion to Dismiss." I agree that the August 21 motion to dismiss the original complaint was mooted by the filing of the amended complaint, and the motion to dismiss is therefore denied as moot. *See, e.g., United Magazine Co. v. Murdoch Magazines Distribution, Inc.,* 146 F.Supp.2d 385, 416 (S.D.N.Y.2001).

2. In some of the agreements, this provision is contained in § 23(a), due to the addition of a "Death or Disability Exemption" at § 3. *See* Arbitration Motion Exs. 2, 8.

3. The reference to "this Section 21" appears to be a typographical error. Section 21 contains no "rules" concerning arbitration or dispute resolution, but provides that each party will have the right to specifically enforce the Agreement in the event of a breach by the other party. Section 22(b) does set forth certain rules governing arbitration, and it appears that those are the rules referred to in § 22(a).

natory can both enforce, and be bound by, an arbitration agreement.

In fact, the Second Circuit has "repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to 'ordinary principles of contract and agency.'" *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir.1999) (citing *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir.1980)), *cert. denied*, 531 U.S. 815, 121 S.Ct. 51, 148 L.Ed.2d 20 (2000); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir.1993). "These principles include '(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.'" *Smith/Enron*, 198 F.3d at 97 (quoting *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). "[S]uch determinations are often 'fact specific' and differ with 'the circumstances of each case.'" *Id.* (quoting *Thomson–CSF*, 64 F.3d at 777–78).

In the case at bar, I find that Edwards can seek to enforce the arbitration agreement against plaintiffs under both agency and veil-piercing/alter ego theories. There is no dispute that at the time the Agreements were signed, Edwards was an agent of ETS. Though plaintiffs assert that an agency theory has no application here because their claims against Edwards are based solely on his alleged status as a "control person" (rather than as an agent) with respect to ETS, "this is a distinction without a legal difference." *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). In *Roby*, the Second Circuit held that individual chairs of the governing bodies of Lloyd's insurance syndicates were entitled

to rely on arbitration provisions incorporated into their employers' agreements in a securities action brought by investors in the syndicates, notwithstanding that the chairs were not signatories to any agreement with the investors.

In reaching that holding, the Second Circuit stated that "[c]ourts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." *Id.* (citing *Nesslage v. York Securities, Inc.*, 823 F.2d 231, 233–34 (8th Cir.1987); *Scher v. Bear Stearns & Co.*, 723 F.Supp. 211, 216–17 (S.D.N.Y.1989); *Brener v. Becker Paribas, Inc.*, 628 F.Supp. 442, 451 (S.D.N.Y.1985)). The plaintiffs in *Roby* had argued that this principle did not apply to their claims against the individual chairs because the chairs had been sued only as "controlling persons" under the securities laws. Rejecting that argument, the court stated:

> We believe that this is a distinction without a legal difference. The complaints against the individual Chairs are completely dependent on the complaints against the Agents.[4] Whether the individual Chairs are disclosed agents or controlling persons, their liability arises out of the same misconduct charged against the Agents. If the scope of the Agents' agreements includes the Agents' misconduct, it necessarily includes the Chairs' derivative misconduct. Moreover, we believe that the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements. If it were otherwise, it would be too easy to circumvent the agreements

---

**4.** "Agents" refers to Managing Agents, who managed the syndicates within Lloyd's, and to

Member Agents, who represented Lloyd's investors. 996 F.2d at 1357.

by naming individuals as defendants instead of the entity Agents themselves. *Id.*

Plaintiffs here contend that *Roby* is distinguishable from the case at bar because in *Roby* the court found that the chairs were third-party beneficiaries of the agreements, and that they were disclosed agents of direct parties to the arbitration agreement. I am not persuaded by this argument. The thrust of the court's reasoning in *Roby* was that it *did not matter* whether the chairs were disclosed agents or controlling persons, since their liability arose out of the same misconduct alleged against the agents. As in *Roby*, "it would be too easy to circumvent the [arbitration] agreements" simply by naming Edwards as a control person, instead of naming him as an agent of ETS, or naming ETS itself. *See also Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990) (if a party "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified"); *Kahn v. Peak*, No. 91 C 7148, 1992 WL 142297 *3 (N.D.Ill. June 18, 1992) (addressing plaintiff's contention that an arbitration provision could not be enforced against defendant because he was sued only as a "controlling person" of the corporate defendant, court stated that "[w]here Kahn has alleged that Peak is Peak Financial's agent for purposes of liability, he cannot claim Peak is not Peak Financial's agent to defeat enforcement of the arbitration clause as to Peak").

Plaintiffs' own allegations in the complaint also suggest that ETS was a corporate alter ego of Edwards. Edwards was ETS's President, CEO, and majority shareholder, and is alleged to have "exercise[d] control over the operations of ETS in connection with the conduct alleged" in the complaint. Amended Complaint ¶ 1, 15. Plaintiffs allege that while ETS ended up in bankruptcy, Edwards personally profited from the alleged scheme to the tune of about $7,000,000. Amended Complaint ¶ 35. Those allegations suggest that Edwards simply used ETS as a vehicle with which to perpetrate a fraud. Since plaintiffs' own allegations indicate that, with respect to the underlying transactions, ETS and Edwards were virtually one and the same, I believe that he should therefore be deemed to be covered by the arbitration clause in the Agreement that he signed on ETS's behalf. *See Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975) (holding that company could be compelled to arbitrate even if not party to agreement containing arbitration clause, where company was alter ego of another party that clearly was subject to arbitration), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

The Second Circuit has also recognized an additional circumstance in which a signatory can be estopped from avoiding arbitration with a non-signatory: "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* at 98 (quoting *Thomson–CSF*, 64 F.3d at 779); *accord Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir.2001). I find that this case falls into that category as well.

Plaintiffs argue that their claims are not based on the Agreement, because they do not seek to enforce the Agreement, but to rescind it. Nevertheless, the Agreement lies at the heart of this dispute; it played a central role in the scheme allegedly carried out by Edwards. The Agreement, together with the COCOTs and related

agreements, are alleged to be the very "securities" at issue that bring this action within the scope of the federal securities laws. Amended Complaint ¶ 21. It would be virtually impossible to litigate or resolve this case without extensive reference to the Agreement. Accordingly, I conclude that Edwards's status as a nonparty (in his personal capacity, at least) to the Agreement does not bar him from seeking to enforce the arbitration clause contained in the Agreement. *See Choctaw*, 271 F.3d at 407 (signatory was estopped from avoiding arbitration with non-signatory where controversy at issue in suit was "linked textually" to contract containing arbitration agreement).[5]

## II. Whether Edwards Has Waived His Right to Compel Arbitration

■ Plaintiffs contend that Edwards has waived his right to compel arbitration, essentially because he moved to dismiss on August 21, 2001, necessitating the expenditure of time and effort by plaintiffs' counsel to respond to that motion, and then filed the arbitration motion on October 18, 2001. Plaintiffs contend that Edwards is attempting to use "procedural devices" to drive up plaintiffs' costs of litigation.

The Second Circuit "ha[s] emphasized that there is a strong presumption in favor of arbitration and that waiver of the right to arbitration is not to be lightly inferred." *Coca-Cola Bottling Co. of New York, Inc. v. Soft Drink and Brewery Workers Union Local 812*, 242 F.3d 52, 57 (2d Cir.2001) (quoting *Cotton v. Slone*, 4 F.3d 176, 179

(2d Cir.1993) (internal quotes omitted)). "The waiver determination necessarily depends upon the facts of the particular case and is not susceptible to bright line rules." *Cotton*, 4 F.3d at 179. "Factors to consider include (1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense." *Kingston v. Latona Trucking Inc.*, 159 F.3d 80, 83 (2d Cir.1998), *cert. dism'd*, 528 U.S. 1058, 120 S.Ct. 629, 145 L.Ed.2d 506 (1999).

Consideration of these factors here does not support a finding that a waiver has occurred. Defendant filed his motion to arbitrate about four and one-half months after he was served with the summons and complaint, which, while not immediate, is not an unduly lengthy period of time, either. Although defendant did file a motion to dismiss, there has not yet occurred a substantial amount of litigation in this case, and there has been no discovery. In addition, although plaintiffs' counsel was required to respond to the motion to dismiss, I believe that, in light of the strong presumption against a waiver of the right to arbitrate, this relatively modest delay and expenditure of effort does not justify finding a waiver to have occurred. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 122 (2nd Cir.1991) ("delay standing alone is an insufficient basis to

---

5. Judge Moody of the Middle District of Florida recently reached a similar conclusion in a number of actions against Edwards and other defendants arising out of the same alleged scheme as this case. *See, e.g., Dunstan v. ETS Payphones, Inc.*, No. 8:01-cv-265-T-30EAJ, slip op. at 9 (M.D.Fla. Jan. 18, 2002) ("The allegations against the Edwards Defendants in their individual capacities [as control de-

fendants] are ... 'intimately founded in and intertwined with the underlying contract obligations' ") (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993), *cert. denied*, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994)), Defendant's Notice of Supplemental Authority (Docket Item 33) Ex. 1.

support waiver"); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985) (where defendants participated in eight months of litigation, took extensive discovery, and brought a motion to dismiss before invoking arbitration clause, there was no waiver, because expense and delay of eight months of litigation was not sufficiently prejudicial); *Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457, 461–66 (2d Cir.) (neither defendant's filing of motion to dismiss complaint nor its delay in raising arbitration claim constituted waiver of right to arbitrate under prior consent judgment, in absence of any prejudice to plaintiff), *cert. denied*, 474 U.S. 819, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985).

### III. Whether Plaintiffs Validly Entered into an Agreement to Arbitrate

Plaintiffs next contend that they cannot be compelled to arbitrate, because they are challenging the validity of the arbitration clauses themselves. Plaintiffs contend that the Agreement containing the arbitration clause is unconscionable because Edwards took advantage of plaintiffs' relative lack of sophistication in investment matters by fraudulently inducing them to part with their money in return for promises of guaranteed profits. Plaintiffs also claim that the terms of the arbitration agreement also render it unconscionable because it provides for arbitration in Georgia, which would be prohibitively expensive for plaintiffs.

In addition, several plaintiffs have raised questions about whether they actually signed the Agreement. Plaintiffs Raymond G. Dassero, Betty E. Lyon, Donald L. Mason, Carlos F. Mesa each states that although "it appears to be" that plaintiff's signature on the last page of the Agreement, he or she has "no recollection" of signing any such document. Dassero Declaration (Docket Item 31) ¶ 6, Lyon Declaration (Plaintiff's Response to Arbitration Motion Ex. F) ¶ 6, Mason Declaration (Plaintiff's Response Ex. G) ¶ 6, Mesa Declaration (Plaintiff's Response Ex. H) ¶ 6. Plaintiff Shirley Narburgh makes a similar statement, and adds that in what purports to be her signature on the Agreement, "[t]here appears to be a space between the 'r' and the 'g' in my last name. That is not the way I sign my name. Therefore, I question whether this is my signature." Narburgh Declaration (Plaintiff's Response Ex. I) ¶¶ 7, 10.

Plaintiff Paul Szwejbka states that he was never presented with and did not sign the Agreement, and that the signature on the Agreement is not his. Szwejbka Declaration (Plaintiff's Response Ex. J) ¶¶ 7, 8. From the copy of the Agreement relating to Szwejbka submitted by defendant, it does not appear that the signature on that document even purports to be his; rather, it has been signed in someone else's name (which is not completely legible) as an ("Authorized Officer" of "Reliance Trust Company as Custodian FBO Paul J. Szwejbka"). Arbitration Motion Ex. 8. Thus, Szwejbka does not appear to allege that his signature was forged on the Agreement, but simply that he did not sign it. He does not state whether he recognizes the signature of the person who did sign it, or whether that person had authority to sign the Agreement on Szwejbka's behalf.

The other two plaintiffs, Donna C. Heiler and James G. Fagan, do admit signing the Agreement. Heiler states that she recalls signing the Agreement, but that she did so after she had already made her "investment" of $49,000. Heiler Declaration (Plaintiff's Response Ex. E) ¶ 8. Similarly, Fagan states that he does recall signing the Agreement, but that he did so months after he had already made his first

"investments."[6] Fagan Declaration (Docket Item 30) ¶ 7. Both Heiler and Fagan state that they did not read anything in the documents about a dispute resolution procedure or arbitration when they signed the Agreement. Heiler, Fagan Declarations ¶ 8.

Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). The Supreme Court has construed § 2 as meaning that state law may be applied to an arbitration agreement "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). At the same time, however, "[j]udicial interpretation of [9 U.S.C. § 4, which directs the district court to hear the parties and to issue an order compelling arbitration 'upon being satisfied that the making of the arbitration agreement or the failure to comply therewith is not in issue'] has established

that the matters which a district court may consider are extremely limited. Such court may decide only issues relating to the making and performance of the arbitration clause itself as opposed to the validity and enforceability of the encompassing agreement under dispute." *International Imaging Materials, Inc. v. Oliverio*, No. 88–CV–638, 1988 WL 137717 *1 (W.D.N.Y. Dec. 20, 1988) (citing *Prima Paint v. Flood & Conklin*, 388 U.S. 395, 403–05, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Conticommodity Services v. Philipp & Lion*, 613 F.2d 1222, 1225 (2d Cir. 1980)).

■ Thus, while the district court may and should consider issues relating to alleged fraud in the inducement of the arbitration clause *itself*, claims regarding fraud in the inducement of a contract *containing* an arbitration clause are generally for the arbitrator in the first instance. As the Supreme Court explained in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967),

if the claim is fraud in the inducement of the arbitration clause itself-an issue which goes to the "making" of the agreement to arbitrate-the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.... We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.

---

6. In what appears to be a typographical error, Fagan states that he recalls signing the Agreement documents on February 7, 2000, and the Option to Sell Agreement on September 8, 2000, "long after I had already made my first investments on October 15, 2000[sic] and October 26, 2000, [sic] and my second investment on July 18, 2000[sic] and parted with my funds." Fagan Declaration ¶ 7.

*See also St. Paul Fire and Marine Ins. Co. v. Courtney Enterprises, Inc.*, 270 F.3d 621, 624–25 (8th Cir.2001) ("the court's focus is 'the making of the agreement for arbitration,' 9 U.S.C. § 4, not the entire underlying agreement. For example, the court may consider whether there was fraud in the inducement of the arbitration clause but it may not consider a defense of fraud in the inducement of the underlying contract. The latter issue goes to the merits of the dispute and is for the arbitrator") (citing *Prima Paint*, 388 U.S. at 402–04, 87 S.Ct. 1801).

■ As stated, one of the arguments advanced by plaintiffs is that enforcement of the arbitration provision should be avoided on the ground of unconscionability. Plaintiffs base this contention on allegations of unconscionable conduct on the part of ETS and Edwards, such as misrepresentations about the financial risks plaintiffs were taking, failure to make plaintiffs aware of the existence of the arbitration provision, etc.

To the extent that these claims go to the Agreement itself, they are for an arbitrator to decide in the first instance, not the court (assuming that the court otherwise finds the arbitration agreement to be enforceable). "Courts ... have held that allegations that a contract containing an arbitration clause was unconscionable or a contract of adhesion is an issue for the arbitrator to decide and not the court." *Bernard Schank Assoc., Inc. v. Flood*, No. 84 CIV. 6088, 1985 WL 3404 *3 (S.D.N.Y. Oct.24, 1985) (collecting cases). *See Rollins v. Foster*, 991 F.Supp. 1426, 1434 (M.D.Ala.1998) ("Whether the contract as a whole is unconscionable is an issue for the arbitrator to decide, should the court grant [plaintiffs'] petition to compel arbi-

tration"); *accord Gutierrez v. Academy Corp.*, 967 F.Supp. 945, 947 (S.D.Tex.1997).

■ To the extent that plaintiffs contend that the arbitration clause itself is unconscionable, I am not persuaded on the record before me. "An unconscionable contract is one that is 'so grossly unreasonable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" *Metropolitan Property & Cas. Ins. Co. v. Budd Morgan Cent. Station Alarm Co.*, 95 F.Supp.2d 118 (E.D.N.Y. 2000) (quoting *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988)). To establish unconscionability there must be a showing of both substantive and procedural unconscionability. To determine whether substantive unconscionability has been shown requires the court to look at the substance of the bargain and decide whether the "terms were unreasonably favorable to the party against whom unconscionability is urged." *D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc.*, 873 F.Supp. 786, 794 (E.D.N.Y.1995) (quoting *AT & T v. New York City Human Resources Admin.*, 833 F.Supp. 962, 988–89 (S.D.N.Y.1993)). Procedural unconscionability relates more to the facts surrounding the transaction itself, such as the use of fine print in the written contract, the relative bargaining power of the parties, and so on. *D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc.*, 873 F.Supp. 786, 794 (E.D.N.Y.1995) (quoting *AT & T*, 833 F.Supp. at 988).

On its face, the arbitration provision, is unremarkable, and appears to be nothing more than a garden-variety arbitration clause.[7] The mere fact that the arbitration is to take place in Georgia is certainly not "grossly unreasonable," even if it is rela-

---

7. If defendant were indeed involved in the scheme that plaintiffs claim he was, one would *expect* the Agreement to contain nothing that would tend to raise one's suspicions.

tively inconvenient for plaintiffs. In addition, while Edwards may have had some advantage over plaintiffs in terms of his business sophistication, that would not excuse plaintiffs from their obligation to read the Agreement before they signed it.[8] I therefore find no basis upon which to bar enforcement of the arbitration provision on the ground of unconscionability.

■ As stated, however, some plaintiffs have asserted that they did not sign (or at least do not recall signing) the Agreement. Courts have drawn a distinction between challenges to the *validity* of the underlying contract and challenges to its very *existence*. Where there is a dispute about whether any contract ever even came into being, that issue is generally considered to be one for the court to determine.

For example, in *Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851 (11th Cir. 1992), it was undisputed that the plaintiff had never signed two customer agreements (which contained arbitration clauses) for a securities trading account with the defendant. The district court denied the defendant's motion for immediate arbitration, ruling that it would first have to decide whether the plaintiff had a duty to arbitrate (on the ground that she had ratified the agreements by her conduct, for example). The Eleventh Circuit affirmed, stating that where a

> party is challenging the very existence of any agreement, including the existence of an agreement to arbitrate[,] ... there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act. If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitra-

tion at all. Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language.

*Id.* at 854. Stating that the defendant's reliance on the Supreme Court's decision in *Prima Paint* was misplaced, the Court of Appeals said that *"Prima Paint* has never been extended to require arbitrators to adjudicate a party's contention, supported by substantial evidence, that a contract *never existed at all."* *Id.* at 855.

Similarly, in *Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587 (7th Cir.2001), there was a dispute over who should pay losses incurred on seven insurance policies. The defendant had underwritten the policies, and contracts apparently reflecting the plaintiff's agreement to reinsure those risks were in the defendant's files, but the plaintiff denied that it had agreed to any such reinsurance. A broker had written the reinsurance on the plaintiff's behalf, but the plaintiff contended that the broker had neither actual nor apparent authority to bind the plaintiff in that regard.

The dispute before the Seventh Circuit concerned which tribunal should determine whether the broker had such authority. The defendant contended that the issue should be submitted to an arbitrator, relying upon an arbitration provision in the agreements signed by the broker, purportedly on the plaintiff's behalf. The plaintiff wanted the dispute resolved in court. The Court of Appeals held that the issue was for the district court to decide in the first instance.

---

8. Of course, if plaintiffs did not sign the Agreement, or if the arbitration clause was not present in the document that they did sign, they may have a defense to enforcement of the arbitration provision, but that is a separate issue and is discussed below.

Observing that "[m]any appellate courts have held that the judiciary rather than an arbitrator decides whether a contract came into being," *id.* at 591 (citing cases), the court stated that when a person forges another's signature, or where an agent makes a commitment on the principal's behalf without authority to do so,

> no contract came into being; and as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrator (unless the parties agree to arbitrate this issue after the dispute arises). It was possible to arbitrate in *Prima Paint* without circularity; in forgery and agency cases, by contrast, the arbitrator's authority to resolve the dispute would depend on one particular answer to that very dispute. Only a court can break that circle.

*Id. See also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1142 (9th Cir.1991) (whether signatory to contract that provided for binding arbitration had authority to bind named party was to be decided by court rather than by arbitrator, as issue went to existence of agreement; "To require the plaintiffs to arbitrate where they deny that they entered into the contracts would be inconsistent with the 'first principle' of arbitration that 'a party cannot be required to submit [to arbitration] any dispute which he has not agreed so to submit' ") (citing *AT & T Techs., Inc. v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *Jolley v. Welch,* 904 F.2d 988, 993–94 (5th Cir.1990) (district court was justified in declining to refer plaintiff investor's claims against stock brokerage to arbitration, in light of defendant brokerage's failure to introduce client option agreement containing arbitration clause and purportedly bearing plaintiff's signature, after issue arose regarding possible forgery of signatures on option

agreements); *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 676–78 (2d Cir.1972) (defendants had shown enough to create issue over whether valid charter agreement containing arbitration clause existed and whether one of the defendants was a party to that agreement, thereby entitling them to trial of those issues under § 4 of FAA); *Gregory v. Interstate/Johnson Lane Corp.,* 188 F.3d 501 (table), 1999 WL 674765 (4th Cir. Aug.31, 1999) (reversing order dismissing complaint on ground that dispute was required by parties' arbitration agreement, and remanding with directions to district court to determine whether plaintiff-who claimed that her signatures on underlying agreements were forgeries-signed or was otherwise bound by agreement to arbitrate) (unreported case).

To the extent that plaintiffs have raised a genuine issue concerning whether they signed the Agreement, then, the court-not an arbitrator-must first decide whether plaintiffs did in fact enter into the Agreements containing the arbitration clause. At the same time, however, it is not necessarily enough for plaintiffs simply to aver, in conclusory fashion, that they do not recall signing the Agreement. In *Chastain,* the Eleventh Circuit, addressing the defendant's argument raising the "specter of contractual parties lying to avoid arbitration," stated that such fears were unfounded, since a "party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather, that party must substantiate the denial of the contract with enough evidence to make the denial colorable." 957 F.2d at 855. In *Chastain,* the court held that the defendant's concession that it did not obtain the plaintiff's signature or a power of attorney adequately substantiated the plaintiff's denial of entering into a contract. *Id. See also Manning v. Energy*

*Conversion Devices, Inc.*, 833 F.2d 1096, 1103 (2d Cir.1987) ("A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4"); *Gregory*, 1999 WL 674765, *2 (plaintiff who provided opinion of experienced handwriting expert with background in F.B.I., who opined that what purported to be plaintiff's signatures on agreements were forgeries, raised sufficient issue of fact to require district court to determine whether plaintiff signed or was otherwise bound by agreement to arbitrate); *Ferguson v. Countrywide Credit Indus., Inc.*, No. CV00–13096, 2001 WL 867103, *1 (C.D.Cal. Apr.23, 2001) (plaintiff raised genuine dispute regarding whether arbitration agreement governed her claims, and was therefore entitled to trial of the issue, where she denied having signed agreement and pointed out that signature and printed name on the document appeared to have been traced over or otherwise altered); *Prevost v. Burns Int'l Security Services Corp.*, 126 F.Supp.2d 439, 441–42 (S.D.Tex.2000) (finding that plaintiff's sworn affidavit stating that signature on arbitration agreement was not his, combined with differences between plaintiff's purported signatures on documents submitted by defendant and exemplar signatures on plaintiff's driver's license and social security card, made it necessary to conduct trial on issue of whether plaintiff signed agreement to arbitrate); *cf. Sheet Metal Workers' Ass'n Local 19 v. J.S. Mech. Contractors, Inc.*, 973 F.Supp. 516, 521 (E.D.Pa.1997) (defendant corporation, which submitted no affidavit, deposition testimony, report from handwriting expert, or other evidence to support assertion that defendant's president did not sign letter expressing defendant's intent to be bound by collective bargaining agreement containing arbitration provision, failed to create genuine issue of material fact, and was therefore bound to arbitrate).

■ In the case at bar, I find that at least some of the plaintiffs have raised an issue of fact concerning whether they, or someone with authority to sign on their behalf, signed the Agreement. As stated, it appears that plaintiff Szwejbka did not sign it, and it is unclear who did or whether there are circumstances under which Szwejbka could be bound by that person's signature. Plaintiff Narburgh has also stated in her sworn declaration that the signature that appears on the Agreement bearing her name "is not the way I sign my name," which casts at least some doubt on whether the signature is authentic. Those allegations, I believe, are enough to give rise to the right to a trial provided by 9 U.S.C. § 4, which states that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

■ It is less certain that the other plaintiffs have made an equally sufficient showing. Two plaintiffs admit that they signed the Agreement, and the rest simply say that they do not remember signing, but that the signatures do appear to be theirs. Nevertheless, since it is clear that a trial must be held pursuant to § 4, and since all the plaintiffs do raise at least some allegations concerning whether or under what circumstances they signed the Agreement, in the interests of judicial economy the court is prepared to try all the plaintiffs' claims in this regard. Because plaintiffs themselves, however, have expressed a strong interest in resolving their claims against defendant quickly and without incurring unnecessary costs, plaintiffs may wish to consider whether they do in fact want a trial of each plaintiff's claims under § 4.

Section 4 provides that "Where such an issue [over making of the arbitration agreement or the failure, neglect, or refusal to perform the agreement] is raised, the party alleged to be in default may ... on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose." In the case at bar, plaintiffs have made a timely demand for a jury trial. *See* Plaintiffs' Response at 22. Accordingly, the court is prepared to hold a jury trial limited to the issue of whether plaintiffs signed, or are otherwise bound by, the Agreement. *See Investors Capital Corp. v. Brown*, 145 F.Supp.2d 1302, (M.D.Fla.2001) (plaintiff investment company was entitled, pursuant to 9 U.S.C. § 4, to jury trial on issue whether defendant investors established informal relationship with investment company sufficient to establish themselves as "customers" under National Association of Securities Dealers rule providing for arbitration of disputes); *Austin v. A.G. Edwards & Sons, Inc.*, 349 F.Supp. 615, 617 (M.D.Fla.1972) (setting jury trial on issue of validity of arbitration agreement under 9 U.S.C. § 4); *cf. Russolillo v. Thomson McKinnon Securities, Inc.*, 694 F.Supp. 1042, 1044 (D.Conn.1988) (although plaintiff's affidavit sufficiently raised issue of fact as to existence of agreement including arbitration clause, court would hold bench trial where plaintiff had not made timely demand for jury trial).

Although plaintiffs have requested a jury trial on this issue, the court is mindful of the fact that plaintiffs have opposed defendant's arbitration motion partly on the ground that it would delay the resolution of plaintiffs' claims against defendant and drive up their litigation costs. *See* Plaintiff's Response at 12 (urging court not to allow defendant to "delay a determination of the merits of the claims laid against him"). For simple logistical reasons, a jury trial is often more time-consuming than a bench trial, and the court's flexibility in scheduling a trial may be more limited when that trial is to be before a jury. I will therefore allow plaintiffs to reconsider their request for a jury trial, if they wish. *See PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F.Supp. 177, 183 (S.D.N.Y.1994) (trial on issue of whether plaintiff was required to submit to arbitration would be before jury, unless parties consented to expedited proceeding before the court or a magistrate).

These matters, including the scheduling of the trial itself, the burden of proof at trial, and the length and scope of discovery, if any, *see Prevost*, 126 F.Supp.2d at 443 ("The Court expects that Plaintiff and Defendant will be prepared to set deadlines for a concise discovery period limited solely to the signature issue, in anticipation of an expeditious trial solely on the merits of this forgery claim"); *Donato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 663 F.Supp. 669, 677 (N.D.Ill.1987) (directing parties to prepare expedited discovery schedule on forgery issue), will be further discussed at a conference with the court on **March 6, 2002, at 11:00 a.m.**

## CONCLUSION

Defendant's motion to compel arbitration and to stay proceedings (Docket Item 23) is denied at this time. A conference with the court is hereby scheduled for **March 6, 2002, at 11:00 a.m.**, at which time the court expects to set this case down for a trial limited to issues relating to whether plaintiffs signed the agreements containing the arbitration provisions at issue. Following the conclusion of that trial, defendant may renew his motion, if appropriate.

Defendant's motion to dismiss the complaint (Docket Item 12) is denied as moot.

IT IS SO ORDERED.