OPINION OF THE COURT
Kenneth R. Fisher, J.
Two disaffected members of a limited liability company (LLC), plaintiffs Conrad R. Hoffman and George B. Fazekas, move by *180 order to show cause for a preliminary injunction enjoining the LLC from making payments of money or other assets owned by it to any LLC member until final determination of this action seeking dissolution. Defendant cross-moves to compel arbitration in accordance with the broad arbitration provision in the LLC’s operating agreement.
The two disaffected plaintiffs allege that they began making specialized cameras in 1995, and then brought three other engineers into the business in March 2000. The five of them formed a LLC, with the two plaintiffs serving as president and treasurer. All five signed the operating agreement. Under the terms of the operating agreement, each individual became a “Member” of the LLC upon formation, and acquired their respective shares of the 100 “Units” of the company. The LLC can “act” by a vote of the majority of all outstanding “units” present at a member meeting (section 7.4), except in respect to certain “major decisions,” including “the taking of any action which would cause a termination, dissolution or liquidation of the Company.” (Section 5.5 [b].) Concerning such “major decisions,” the operating agreement provides that “[n]o authorization or action taken . . . shall be effective or binding on the Company unless approved by the unanimous vote or written consent of the members.” (Section 5.5 [preamble].)
In May 2002, one of the three members brought in by plaintiffs, Robert Kolbet, offered to become president, promising the two plaintiffs that he could improve the business regimen and thereby free up the plaintiffs for creative work. According to the complaint, however, after Kolbet became president, he teamed up with the two other LLC members, James Mormski and Gregory Terrance, to freeze out the two plaintiffs. Things came to a head in the fall of 2004, when plaintiffs demanded an accounting, and discovered that Kolbet and his faction were paying themselves considerable sums which plaintiffs contend were not authorized under the terms of the operating agreement or the Limited Liability Company Law. In addition, according to plaintiff Hoffman, who remains the LLC’s treasurer, the payments were made to Kolbet’s faction despite the terms of section 10.8 of the operating agreement which vouchsafes the custody and disbursement of LLC funds to the treasurer. Ultimately, plaintiffs seek dissolution, an accounting, and a declaratory judgment that the payments made were wrongful under the operating agreement and Limited Liability Company Law.
*181 Instead of naming the individual Kolbet faction members as defendants, plaintiffs named the LLC itself, which is not a signatory to the operating agreement containing the arbitration clause.[1] The arbitration clause reads as follows:
“Section 14.1 Alternative Dispute Resolution
“(a) The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that same spirit of cooperation that they pledge to attempt to resolve any dispute amicably and without litigation. Accordingly, the Members agree that if any dispute arises, they will utilize the procedure set forth in this Article XIV to resolve such dispute.
“(b) The initiating Member shall give written notice to the other Member describing in general terms the nature of the dispute. The Members agree to promptly, and in no event later than 10 days from the date of the initiating Member’s written notice, meet to discuss the resolution of the dispute.
“(c) If the dispute has not been resolved within 15 days from the date of their initial meeting, then the Members agree that the dispute shall be settled by arbitration in accordance with the provisions of the Commercial Arbitration Rules of the American Arbitration Association . . . .” (Operating agreement, article XIV § 14.1 [emphasis supplied].)
The broad language of the arbitration clause reveals that the members intended that virtually all disputes pertaining to the LLC be submitted to arbitration (there is in section 14.2 an exception for determining fair value of the units, which is not an issue here). With that one exception, the parties “contracted] to submit every part of their disputes to arbitration,” i.e., for “plenary alternative dispute resolution.” (Matter of Smith Barney Shearson v Sacharow, 91 NY2d 39, 48, 49 [1997].)
Discussion
The general rule applicable to the cross motion is stated as follows:
“It has long been the rule in this State that the par *182 ties to a commercial transaction ‘will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit commitment neither party may be compelled to arbitrate.’ ” (Matter of Marlene Indus. Corp. [Carnac Textiles], 45 NY2d 327, 333 [1978], quoting Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. [United Liverpool Faculty Assn.], 42 NY2d 509, 512 [1977]; see CPLR 7501 [requirement that agreement to arbitrate be in writing]; County of Onondaga v U.S. Sprint Communications Co., 192 AD2d 1108, 1109 [4th Dept 1993] [“(generally, the right to compel arbitration does not extend to a nonparty unless the agreement itself so provides” (emphasis supplied)].)
As the emphasized portion of the above passage from U.S. Sprint Communications suggests, however, this rule is not immutable. The Court of Appeals recognizes that “in certain limited circumstances the need to impute the intent to arbitrate to a non-signatory” is appropriate. (TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 339 [1998].) In this case, there is a need to impute an intent to arbitrate to defendant.
First, it must be observed that, unlike the submission of existing disputes to arbitration which require a writing signed by the party to be charged, in the context of an agreement to submit future disputes to arbitration, the statutory requirement of a writing does not include as a necessary component a signature. (Matter of Helen Whiting, Inc. [Trojan Textile Corp.], 307 NY 360, 368 [1954] [“while a contract to arbitrate future controversies must be in writing, it need not be signed so long as there is other proof that the parties actually agreed on it”]; Metropolitan Arts & Antiques Pavilion v Rogers Marvel Architects, 287 AD2d 372, 372 [1st Dept 2001] [“no requirement that a written agreement to arbitrate be signed ... as long as there is an express, unequivocal agreement to arbitrate”]; Getlan v Josephthal & Co., 91 AD2d 971, 972 [2d Dept 1983] [“no requirement that an agreement to arbitrate future disputes be signed”]; Trafalgar Sq. v Reeves Bros., 35 AD2d 194, 196 [1st Dept 1970] [CPLR 7501 “does not require that such an agreement be signed by the party to be bound”].) Here, there is no question of the existence of a writing, which was subscribed by every person concerned with defendant Finger Lakes Instrumentation, LLC (FLI) except the entity itself, and which contained a *183 virtually plenary arbitration provision. The only question is whether the parties, including FLI, agreed to arbitrate future disputes. (Crawford v Merrill Lynch, Pierce, Fenner & Smith, 35 NY2d 291, 299 [1974] [“no requirement that the writing be signed ‘so long as there is other proof that the parties actually agreed on it’ ”], quoting Matter of Helen Whiting, Inc. [Trojan Textile Corp.], 307 NY at 368.)
In Crawford, the plaintiff signed an application for employment at Merrill Lynch in 1967, which contained a provision by which plaintiff agreed to arbitrate disputes before the New York Stock Exchange. After working for Merrill Lynch for over three years, he left the firm and sued for commissions earned. When confronted by Merrill Lynch with his signed agreement providing for arbitration of his claims, he asserted that Merrill Lynch never signed the agreement, and that he was, therefore, entitled to arbitrate before a different tribunal. The Court of Appeals, recognizing that Merrill Lynch was a nonsignatory, nevertheless held that the matter should be submitted to arbitration at Merrill Lynch’s behest because the evidence was that Merrill Lynch agreed to arbitrate. {Id. at 299-300.)
Since Crawford, it has been held, in similar circumstances, that a signatory’s effort to avoid an arbitration clause it drafted was “baseless.” (Rudolph & Beer v Roberts, 260 AD2d 274, 275 [1st Dept 1999].) The court found an obvious inequity in the signatory’s position in that “plaintiff here seeks to deny defendant the benefit of an arbitration clause in an agreement which defendant did not sign, but which plaintiff always treated as governing the parties’ relationship.” (Id.) The court observed: “Plaintiffs effort to avoid the arbitration clause is particularly disingenuous, in light of the fact that plaintiff is the one . . . whose conduct most clearly shows an intent to be bound by the contract containing this clause.” (Id. at 276.) Similarly, in Ranieri v Bell Atl. Mobile (304 AD2d 353 [1st Dept 2003]), the court held “that plaintiff’s claim that the nonsignatory defendants are not entitled to the benefit of the arbitration provision contained in the Agreements is inconsistent with his claim that they are liable to him under those Agreements for breaches of contract.” (Id. at 354.) That is the precise argument defendant FLI makes in this case, which sounds in equitable estoppel, and which is persuasive. The Crawford line of cases thus requires that defendant’s cross motion be granted.
This result is consistent with what would be ordered under the Federal Arbitration Act. Inasmuch as the federal statute “is *184 almost identical to, and is derived from, our own arbitration statute,” (Matter of Weinrott [Carp], 32 NY2d 190, 198-199 [1973]), the Court of Appeals has announced a policy of “consistency” where that can be accomplished without violating either statute. {Id. at 199-200 n 2 [“bothersome to have different rules applied in interstate commerce cases from those applied in intrastate commerce cases”]; [“it is a rather technical distinction to apply one law or another depending on whether interstate commerce is involved”].) This policy of consistency has especial application when it comes to consideration of “commercial matters where reliance, definiteness and predictability are such important goals of the law itself.” (Matter of Southeast Banking Corp., 93 NY2d 178, 184 [1999].) So it is worthwhile to examine whether the result reached here is consistent with the federal cases.
As implicitly acknowledged in CDC Capital v Gershon (282 AD2d 217 [1st Dept 2001]), the most complete catalog “of the recognized common-law grounds for enforcing an arbitration agreement against a non-signatory” (id. at 218) appears in Thomson-CSF, S.A. v American Arbitration Assn. (64 F3d 773, 776-780 [2d Cir 1995]). The exception at issue here, equitable estoppel, is itself separated into two classes of cases which often are, but should not be, confused. (Merrill Lynch Inv. Mgrs. v Optibase, Ltd., 337 F3d 125, 131-132 [2d Cir 2003] [“it matters whether the party resisting arbitration is a signatory or not”]; E.I. DuPont de Nemours & Co. v Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F3d 187, 201-202 [3d Cir 2001] [the argument that “these cases (which) bind a signatory (but) not a non-signatory to arbitration” involves a “distinction without a difference” is “wrong”].) The distinction was recognized in Rudolph & Beer v Roberts (260 AD2d at 275 [“it is even clearer that it is unnecessary that it be signed by the party seeking enforcement” of the agreement to arbitrate]).
The doctrine of estoppel, as applied to cases like this one, will bind
“a signatory ... to arbitrate with a nonsignatory at the nonsignatory’s insistence because of ‘the close relationship between the [protagonists] involved, as well as the relationship of the alleged wrongs to the nonsignatory’s obligations and duties in the contract . . . and [the fact that] the claims were “intimately founded in and intertwined with the underlying contract obligations.” ’ ” (Thomson-CSF, S.A., 64 *185 F3d at 779, quoting Sunkist Soft Drinks, Inc. v Sunkist Growers, Inc., 10 F3d 753, 757 [11th Cir 1993], cert denied 513 US 869 [1994], quoting McBro Planning & Dev. Co. v Triangle Elec. Constr. Co., 741 F2d 342, 344 [11th Cir 1984].)
Thus, courts are “willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.” (Thomson-CSF, S.A., 64 F3d at 779.)
Put another way, equitable estoppel applies (1) “[w]hen each of a signatory’s claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory’s claims arise out of and relate directly to the written agreement, and arbitration is appropriate,” or (2) “when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.” (Grigson v Creative Artists Agency, L.L.C., 210 F3d 524, 527 [5th Cir 2000].) Both conditions are easily met on the facts of this case. Indeed, plaintiffs make no serious argument that their claims do not presume the existence of the operating agreement, that their claims arise out of and directly implicate that agreement, that arbitration would not otherwise be appropiate, and that they, as signatories, are raising claims of substantially interdependent and concerted misconduct by both the individual Kolbet faction signatories and the LLC itself. Either of the two conditions for application of equitable estoppel quoted above would be enough, yet both apply here.
“In short, although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement cannot . . . ‘have it both ways,’ ” that is, he “cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains the arbitration provision, but, on the other hand, deny the arbitration’s applicability because the defendant is a non-signatory.” (Id. at 528; see also, JLM Indus., Inc. v Stolt-Nielsen SA, 387 F3d 163, 177-178 [2d Cir 2004] [collecting cases in which the signatory who resists arbitration was estopped by the nonsignatory]; Choctaw Generation Ltd. Partnership v American Home Assur. Co., 271 F3d 403, 404, 406 [2d Cir 2001].)
*186 It matters not that the plaintiff signatory seeks dissolution, if the claims are based, as they are here, on the operating agreement. (Dassero v Edwards, 190 F Supp 2d 544, 549-550 [WD NY 2002] [claim of rescission cannot escape arbitration in this context, because “(i)t would be virtually impossible to litigate or resolve this case without extensive reference to the Agreement”].) If “[a] signatory to a contract providing for arbitration may not elude his obligation by masking himself under a corporate identity” (Glasser v Price, 35 AD2d 98, 101 [2d Dept 1970]), neither may he elude his obligation to submit to arbitration by masking his opponents in the suit in a corporate or LLC identity.[2]
Conclusion
Defendant’s motion to compel arbitration and for a stay is granted. “[N]o claim is advanced that . . . [defendant] failed to give notice.” (Matter of Trump, 303 AD2d at 288; see CPLR 7503 [c].)
Plaintiffs’ motion for a preliminary injunction is denied.
“CPLR 7502 (c) governs provisional remedies in arbitration cases, and provides the courts with limited power to ‘entertain an application for an or *187 der of attachment or for a preliminary injunction in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief.’ ” (Matter of H.I.G. Capital Mgt. v Ligator, 233 AD2d 270, 271 [1st Dept 1996], quoting CPLR 7502 [c].)
Plaintiff must show, in addition, “a likelihood of success on the merits, irreparable injury [and] that the equities balance in their favor.” (Matter of Cullman Ventures [Conk], 252 AD2d 222, 230 [1st Dept 1998].) Plaintiffs have established that defendant is disbursing large sums to three individual members for services plaintiffs believe can be rendered by others for much less. “The uncontrolled disposal of respondents’ assets, which might render an award ineffectual, presents the risk of irreparable harm.” (H.I.G. Capital Mgt., 233 AD2d at 271.) But plaintiffs do not establish by that accusation alone that any award they might receive in arbitration would be rendered ineffectual, nor do they “establish that defendants were hiding or dissipating any assets.” (Spatz v Ridge Lea Assoc., 309 AD2d 1248, 1250 [4th Dept 2003].) Plaintiffs concede that the conduct they complain of was fully revealed in the discovery they were given in response to the demand for an accounting. Furthermore, although it is the rule as plaintiffs contend that “preservation of the status quo with respect to the subject corporation’s governance and assets is necessary to assure its orderly dissolution, the relief [plaintiff presumably will] seek[ ] in arbitration” (Matter of Guarini [Severini], 233 AD2d 196, 196 [1st Dept 1996]), here plaintiffs allege that they were frozen out “soon” after Kolbet became president in May 2002, over two years before plaintiffs demanded an accounting and filed suit. Accordingly, the motion is denied.

. In view of the provisions of the operating agreement set forth above, it is a wonder how the lawsuit could proceed without the Kolbet faction members individually named as defendants. (CPLR 1001.) But defendant has not addressed this issue in its motion papers, and the court, therefore, turns to what is presented.

. Defendant also relies on a line of cases in New York which follow the rule “that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement.” (Roby v Corporation of Lloyd’s, 996 F2d 1353, 1360 [2d Cir 1993], cert denied 510 US 945 [1993]; see Hirschfeld Prods. v Mirvish, 88 NY2d 1054 [1996]; Matter of Trump [Carmel Fifth], 303 AD2d 287 [1st Dept 2003].) In these cases, it is held “that the parties fully intended to protect the individual [employees or agents of the entity] to the extent they are charged with misconduct within the scope of the agreement[ ].” (Roby, 996 F2d at 1360 [adding: “If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves”].) Defendant contends that this case is a “mirror image” of the scenario in these cases, and that therefore they are authority for compelling arbitration here. Because of the disposition above, it is unnecessary to reach this question. No case is cited, nor has one been found, in which this “mirror image” argument was embraced.
Defendant also relies on Matter of Lane (Collidge Abel-Bey—Frank) (70 AD2d 838 [1st Dept 1979], affd on other grounds 50 NY2d 864 [1980]), which held that a close corporation could not resist arbitration when all of the stockholders sign a stockholder’s agreement containing a broad arbitration clause. Plaintiff contends that this holding, not embraced by the Court of Appeals, was based on two sections of the Business Corporation Law (§ 615 [b] and § 620 [a]) that have no counterpart in the Limited Liability Company Law, which is true enough, but that is quite beside the point. The entity party in Lane resisted arbitration, and here the entity defendant seeks to bind the signatories to the agreement. As set forth above, the distinction makes a difference.