In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2102

Sphere Drake Insurance Limited, formerly
known as Odyssey Re (London) Limited,

Plaintiff-Appellee,

v.

All American Insurance Company,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4573--William T. Hart, Judge.

Argued November 7, 2000--Decided July 3, 2001


   Before Bauer, Coffey, and Easterbrook,
Circuit Judges.

   Easterbrook, Circuit Judge.  Who pays
losses incurred on seven insurance
policies is a subject of dispute. All
American Insurance underwrote the
policies. Contracts apparently
representing the agreement of Sphere
Drake Insurance to reinsure these risks
are in All American's files--but Sphere
Drake denies that it has agreed to any
such reinsurance. A broker called Euro
International Underwriting ("eiu") wrote
the reinsurance on Sphere Drake's behalf.
eiu had actual authority to represent
Sphere Drake, but only up to an annual
limit of risks. According to Sphere
Drake, eiu exceeded this limit when
agreeing to reinsure All American's
policies. Moreover, Sphere Drake
contends, All American knew that eiu had
gone over the top, so that eiu had neither
actual nor apparent authority. The
parties appear to agree that if this
defense prevails then Sphere Drake need
not pay; they also agree on the extent of
Sphere Drake's liability if eiu had power
to bind it. What they do not agree on is
which tribunal has the authority to
decide the extent of eiu's authority as
Sphere Drake's agent.

   Sphere Drake wants the dispute resolved
in court--federal court in particular,

because the parties are of diverse nationalities. See 28 U.S.C. sec.1332(a)(2). All American contends that the parties have agreed to arbitrate. It relies on the language in the short form agreements (called slip policies) that eiu signed. The parties concentrate on one particular slip policy, which agrees to reinsure workers' compensation risks. We reproduce the bulk of the slip policy:

CLASS:

To indemnify the Reinsured in respect of their participation on the Unicare Insurance Company, Workers Compensation Excess of Loss Reinsurance contract.

EXCLUSIONS: Employers Liability (Section B of Workers' Compensation Act). In all other respects to follow the original contract in every respect. . . .

GENERAL CONDITIONS:

This Reinsurance is to pay as may be paid, and to follow all terms clauses and conditions on the original contract as detailed under the CLASS section of this Reinsurance.

Several Liability Notice (Reinsurance) LSW 1001.

This contract of Reinsurance shall be governed by and construed in accordance with the law of the state of Illinois, U.S.A. under the jurisdiction of the courts of the state of Illinois, U.S.A. The Arbitration contract shall also be governed by the law and jurisdiction of the state of Illinois, U.S.A.

WORDING:

Agree to sign slip policy.

This acceptance slip constitutes the Policy for all purposes; however, a formal Policy, in substitution for this Slip Policy or any declaration hereunder, will be issued at any time at the request of the (Re-) Insured or any other Underwriters hereon.

All American contends that this policy contains two arbitration clauses. First, the last paragraph of the "General Conditions" section says that "[t]he

Arbitration contract shall also be governed by the law and jurisdiction of the state of Illinois, U.S.A." This use of the definite article, All American insists, establishes that Sphere Drake has agreed to arbitrate. Second, the initial paragraph of "General Conditions" says that the reinsurance follows "all terms clauses and conditions on the original contract"; because the Unicare policy has an arbitration clause, this follow-form slip policy also requires arbitration. Sphere Drake disputes both of these contentions and adds a defense: even if eiu plastered the papers with arbitration clauses that can't kick Sphere Drake out of court on the question whether eiu was its agent. To arbitrate the agency issue, Sphere Drake insists, would be circular, for arbitration is proper if and only if eiu indeed could bind Sphere Drake.

The district court ruled in Sphere Drake's favor by interpreting the text of the slip policy not to provide for arbitration. The last subparagraph is a choice-of-law clause and not an arbitration clause, the judge held; any requirement to arbitrate must be found elsewhere. And the initial subparagraph does not incorporate the Unicare policy's arbitration provision, according to the judge, because it follows only the "clauses and conditions on the original contract as detailed under the CLASS section of this Reinsurance." No arbitration language appears in the "Class" section, so Sphere Drake cannot be required to arbitrate. The court not only denied All American's motion to require arbitration but also enjoined All American from proceeding with arbitration. All American appeals, as 9 U.S.C. sec.16(a)(1)(B) and (a)(2) permit.

The district court read the first subparagraph of the "General Conditions" section as if it said that the reinsurance will "follow all terms clauses and conditions . . . detailed under the CLASS section of this Reinsurance." If this redacted version, deleting "on the original contract as," is the best understanding, then the district court's conclusion follows. The competing way to read this clause is that the reinsurance will "follow all terms clauses and conditions on (the original contract as detailed under the CLASS

section of this Reinsurance)." We have added parentheses to show the grouping All American prefers: the reinsurance follows the terms and conditions of the contract referenced in the "Class" section, not just the terms referenced in the "Class" section.

All American's reading is more plausible, and not just on the technical ground that it avoids the effective deletion of five words from the contract. It is more plausible because the "Exclusions" section provides that the slip policy follows the underlying contract "in every respect" except the one mentioned specifically. This is essential to any follow-form policy. The "Class" section cannot be the source of all terms of the agreement; it does not mention any terms. Thus if the "General Conditions" section requires the reinsurance to follow only the terms specified in the "Class" section, the whole reinsurance arrangement is uprooted. A follow-form policy must have a form, which is to say that form's terms, to follow; yet the district court read this slip policy to be term-and-condition free. What then does it reinsure? What risks are covered? When must claims be filed? Who defends the suits? These questions can be answered only if the slip policy adopts the underlying policy's terms. Here, as in Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42 (2d Cir. 1993), a follow-form reinsurance agreement logically includes an arbitration agreement in the underlying contract. This understanding could be overridden, but this slip policy's "Exclusions" section does not displace the arbitration clause.

Having concluded that the "General Conditions" section incorporates the arbitration agreement in the Unicare pol icy, we can bypass other disputes and cut straight to the question whether eiu's authority is arbitrable. Recall that Sphere Drake and All American would not ask the arbitrator to resolve anything except whether they have a reinsurance agreement in the first place--a question that depends entirely on eiu's authority to bind Sphere Drake. This dispute seems to us covered by the principle that courts, rather than arbitrators, usually determine whether the parties have agreed

to arbitrate. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995); AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643 (1986). This is why four federal judges have parsed the "General Conditions" section to determine whether the slip policy agrees to private dispute resolution; likewise judges must determine whether Sphere Drake agreed to the slip policy. It is a shortcut to say that "the slip policy agrees" to something; pieces of paper don't "agree" to do things. eiu agreed to the slip policy, but whether eiu spoke for Sphere Drake is debated. If All American produced a policy purportedly signed by Sphere Drake's CEO, but evidence showed that a clerk at All American had forged the signature, then Sphere Drake would not have to arbitrate (or pay), see Chastain v. Robinson-Humphrey Co., 957 F.2d 851 (11th Cir. 1992); why would it be different if eiu lacked authority to speak for Sphere Drake? Section 2 of the Federal Arbitration Act, 9 U.S.C. sec.2, says that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." An agent's lack of authority is a ground that prevents the enforcement "of any contract"; does it not follow that judges must determine whether the agent had authority?

According to All American, Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), supplies a negative answer. Prima Paint holds that, unless the arbitration clause excludes such disputes, an arbitrator resolves a claim of fraud in the inducement. This means, All American believes, that all disputes about contract formation go to arbitrators; only disputes about the scope of arbitration clauses (as in AT&T Technologies) are resolved in advance by courts. That is, we suppose, a possible reading of Prima Paint, which sits uneasily alongside AT&T Technologies and First Options. But it is not a plausible reading, for it would disregard the principle that arbitration is contractual. Unless the parties agree otherwise, they are entitled to have courts resolve their disputes. The parties in Prima Paint did agree otherwise and promised to have the arbitrator resolve "[a]ny controversy or

claim arising out of or relating to this Agreement" (emphasis added), the broadest possible clause. Whether one party defrauded another during the negotiations for the agreement "related to" that agreement. There was no doubt that the arbitration agreement (and the contract of which it was a part) had been signed; both sides knew what they were getting. A claim of fraud in the inducement--which boils down to "we wouldn't have signed this contract had we known the full truth about our trading partner"--supposes that the unhappy party did agree, but now wishes it hadn't. If a claim of "we wish we hadn't agreed" could be litigated, even when the arbitration clause is so broad, this would move a good portion of contract disputes back to court and defeat this part of the agreement at the outset, for it is easy to cry fraud. Prima Paint thought it important that no one argued that the arbitration clause was itself the result of fraud; that enabled an arbitrator to resolve defenses to enforcement of the contract without calling into question the arbitrator's own authority to act.

Fraud in the inducement does not negate the fact that the parties actually reached an agreement. That's what was critical in Prima Paint. But whether there was any agreement is a distinct question. Chastain sensibly holds a claim of forgery must be resolved by a court. A person whose signature was forged has never agreed to anything. Likewise with a person whose name was written on a contract by a faithless agent who lacked authority to make that commitment. This is not a defense to enforcement, as in Prima Paint; it is a situation in which no contract came into being; and as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrator (unless the parties agree to arbitrate this issue after the dispute arises). It was possible to arbitrate in Prima Paint without circularity; in forgery and agency cases, by contrast, the arbitrator's authority to resolve the dispute would depend on one particular answer to that very dispute. Only a court can break that circle. Disputes about the adequacy of consideration (or some other formation issues) would be closer questions, for a contract without consideration represents an agreement.

Lack of consideration has historically made the promise unenforceable in court, but parties may be able to create contracts that the public tribunals do not enforce yet private tribunals will enforce. Nonetheless, we have held, a claim of missing consideration will be heard by a court and, if the agreement is not supported by consideration, the dispute will not be sent to arbitration. Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126 (7th Cir. 1997). If this is so, then the treatment of a contract signed by a person who lacks authority follows directly.

Many appellate courts have held that the judiciary rather than an arbitrator decides whether a contract came into being. See, e.g., Sandvik AB v. Advent International Corp., 220 F.3d 99, 105-09 (3d Cir. 2000); N&D Fashions, Inc. v. DHJ Industries, Inc., 548 F.2d 722, 729 (8th Cir. 1976); Three Valleys Municipal Water District v. E.F. Hutton & Co., 925 F.2d 1136, 1139-42 (9th Cir. 1991); Chastain, supra. Most of these decisions involve the same question as our case: whether a dispute about an agent's authority to bind the principal to the contract is arbitrable. Every appellate court that has addressed this question has answered "no, unless. . .". The "unless" clause reflects the fact that parties may agree separately to arbitrate disputes about whether they have agreed to the contract's substantive promises. See First Options, 514 U.S. at 943. The approach of Sandvik and its predecessors is sound, for a person who has not consented (or authorized an agent to do so on his behalf) can't be packed off to a private forum. Courts have jurisdiction to determine their jurisdiction not only out of necessity (how else would jurisdictional disputes be resolved?) but also because their authority depends on statutes rather than the parties' permission. Arbitrators lack a comparable authority to determine their own authority because there is a non-circular alternative (the judiciary) and because the parties do control the existence and limits of an arbitrator's power. No contract, no power.

Nonetheless, All American contends, Colfax Envelope Corp. v. Chicago Graphic Communications Union, 20 F.3d 750 (7th Cir. 1994), commits this circuit to a

minority position. If indeed Colfax held that arbitrators resolve all disputes about contract formation, it would be incompatible with Gibson and much authority elsewhere, and we would be inclined to reconsider our position to eliminate the intra-circuit conflict and avoid being an outlier. See United States v. Carlos-Colmenares, No. 00-3632 (7th Cir. June 7, 2001). But Colfax held no such thing. It concluded that when both parties sign a contract that appears to be definitive, and contains an unmistakable arbitration clause, a dispute about whether the substantive promises are too uncertain to be enforceable is for the arbitrator; if they have agreed on nothing else, we held in Colfax, they have agreed to arbitrate. Many a contract conceals an ambiguity, and sometimes the ambiguity is so important to the bargain that the promises are deemed unenforceable. (Colfax gave as an example the famous Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), where the parties made a contract for the delivery of a shipment of cotton from Bombay to England on the ship Peerless--but, unbeknownst to each, the other had in mind a different ship of that name.) When there is no sound basis for choosing between competing understandings, neither party is bound. But in cases such as Colfax and Raffles both parties thought that they had made and received enforceable promises, and in Colfax they also had agreed to arbitrate. Whether an extrinsic ambiguity is so vital as to preclude enforcement is exactly the sort of question that an arbitrator is supposed to handle; putting such matters in the hands of specialists rather than judges or jurors is one attraction of arbitration. Colfax added that things would be otherwise if even the rudiments of agreement were missing. To avoid arbitration, we wrote, "[t]he party must show that the arbitration clause itself, which is to say the parties' agreement to arbitrate any disputes over the contract that might arise, is vitiated by fraud, or lack of consideration or assent, as in Three Valleys Municipal Water District v. E.F. Hutton & Co., 925 F.2d 1136, 1140 (9th Cir. 1991); that in short the parties never agreed to arbitrate their disputes." 20 F.3d at 754. The holding of Three Valleys, which Colfax cited with approval, is that courts decide whether a

purported agent had the authority to commit its principal to the contract. Cf. Harter v. Iowa Grain Co., 220 F.3d 544, 550 (7th Cir. 2000) (courts decide whether contract with arbitration clause is invalid root and branch as a violation of federal law). So this circuit is not out on a limb.

Sphere Drake may be required to arbitrate if and only if eiu had authority to bind it to these reinsurance contracts. If eiu did have authority, then there appears to be no further dispute that needs to be resolved, by judge or arbitrator. Accordingly, the judgment is affirmed (there will be no arbitration unless some additional issue for private dispute resolution surfaces later in the case) and the case is remanded with instructions to resolve the parties' only real dispute: the extent of eiu's authority.