**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1158**

BERKELEY COUNTY SCHOOL DISTRICT,

Plaintiff – Appellee,

v.

HUB INTERNATIONAL LIMITED; HUB INTERNATIONAL MIDWEST LIMITED,

Defendants – Appellants,

and

KNAUFF INSURANCE AGENCY, INC.; STANLEY J. POKORNEY; SCOTT POKORNEY; BRANTLEY THOMAS,

Defendants.

**No. 19-1170**

BERKELEY COUNTY SCHOOL DISTRICT,

Plaintiff – Appellee,

v.

SCOTT POKORNEY,

Defendant – Appellant,

and

HUB INTERNATIONAL LIMITED; HUB INTERNATIONAL MIDWEST LIMITED; KNAUFF INSURANCE AGENCY, INC.; STANLEY J. POKORNEY; BRANTLEY THOMAS,

Defendants.

No. 19-1171

BERKELEY COUNTY SCHOOL DISTRICT,

Plaintiff – Appellee,

v.

STANLEY J. POKORNEY,

Defendant – Appellant,

and

HUB INTERNATIONAL LIMITED; HUB INTERNATIONAL MIDWEST LIMITED; KNAUFF INSURANCE AGENCY, INC.; SCOTT POKORNEY; BRANTLEY THOMAS,

Defendants.

Appeals from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (2:18-cv-00151-DCN-MGB)

Argued: October 29, 2019                    Decided: December 4, 2019

Before KING, FLOYD, and RUSHING, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Floyd and Judge Rushing joined.

2

**ARGUED:** Michael Gregory Pattillo, Jr., MOLOLAMKEN LLP, Washington, D.C., for Appellants. Joshua S. Whitley, SMYTH WHITLEY, LLC, Charleston, South Carolina, for Appellee. **ON BRIEF:** William J. Cooper, Washington, D.C., Thomas J. Wiegand, Chicago, Illinois, W. Alex Harris, MOLOLAMKEN LLP, New York, New York; Christy Ford Allen, John A. Massalon, WILLS MASSALON & ALLEN LLC, Charleston, South Carolina, for Appellants Hub International Limited and Hub International Midwest Limited. Robert H. Jordan, Amanda C. Williams, PARKER, POE, ADAMS & BERNSTEIN, LLP, Charleston, South Carolina, for Appellant Scott Pokorney. Deborah B. Barbier, DEBORAH B. BARBIER, LLC, Columbia, South Carolina, for Appellant Stanley J. Pokorney. Jeffrey A. Breit, BREIT CANTOR GRANA BUCKNER, PLLC, Virginia Beach, Virginia, for Appellee.

_____

KING, Circuit Judge:

Four defendants in the underlying proceedings — Hub International Limited and Hub International Midwest Limited (collectively, "Hub International"), along with two of their employees, Stanley Pokorney and Scott Pokorney (together with Hub International, the "Appellants") — pursue these consolidated appeals from the district court's denial of their motion to compel arbitration. The Appellants sought arbitration of federal and state claims alleged against them by plaintiff Berkeley County School District ("Berkeley Schools") in the District of South Carolina. The district court denied the Appellants' motion to compel arbitration, ruling that Berkeley Schools had not agreed to arbitrate those claims. *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 363 F. Supp. 3d 632, 651 (D.S.C. 2019) (the "Denial Order"). In rendering its decision, however, the court failed to resolve — in the proper manner — factual disputes that are material to the arbitration agreement issue. Because federal law, that is, 9 U.S.C. § 4, requires those disputes to be resolved in trial proceedings, we vacate and remand.[1]

I.

A.

On January 18, 2018, a plaintiff denominated as the Berkeley County School Board of Trustees filed suit in the District of South Carolina against multiple defendants.

---

[1] Section 4 of Title 9 of the United States Code provides, in pertinent part, that "[i]f the making of [an] arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."

4

Pertinent here, the complaint alleged federal and state claims against the four Appellants, plus Knauff Insurance Agency, Inc. (which Hub International purchased in 2012), and Brantley Thomas, a former Berkeley Schools Chief Financial Officer. The claims were predicated on a massive insurance contract steering and kickback fraud conspiracy that spanned the period from 2001 to 2016, and that was perpetrated by the Appellants, Knauff Insurance, and CFO Thomas. The complaint alleged that the steering and kickback fraud scheme caused Berkeley Schools to lose millions of dollars.

B.

1.

On March 5, 2018, appellant Hub International moved in the district court to compel arbitration of the claims alleged, pursuant to the Federal Arbitration Act (the "Arbitration Motion").[2] Appellants Stanley Pokorney and Scott Pokorney joined the Arbitration Motion, and Hub International supported it with six purported Brokerage Service Agreements between Knauff Insurance and Berkeley Schools, spanning the period from 2002 to 2011 (the "Brokerage Service Agreements" or the "Agreements").[3] The Agreements generally provided that, in exchange for annual fees, Knauff Insurance

---

[2] Although they are named as defendants in the complaint, Knauff Insurance and CFO Thomas did not seek to compel arbitration. Neither Knauff Insurance nor Thomas are appellants in these proceedings.

[3] Hub International also supported the Arbitration Motion with the declaration of Julia Benfield, a former Knauff Insurance employee and current Hub International employee. Benfield declared that she discovered the Brokerage Service Agreements in Hub International's files in its Charlotte, North Carolina, office.

would provide insurance-related services to Berkeley Schools. Those services included identifying risks, reviewing existing insurance contracts, recommending additional insurance policies, arranging the purchase of new policies, and monitoring insurance claims made under the various policies.

The Arbitration Motion emphasized that each of the Brokerage Service Agreements contained an arbitration clause. In that regard, the Agreements provided thusly:

> All disputes, claims or controversies relating to [these Agreements], or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association.

*See* J.A. 91, 96, 101, 106, 114, 121 (the "Arbitration Clauses").[4] Invoking the Arbitration Clauses, the Arbitration Motion contended that the claims alleged in the complaint related to the Agreements and thus had to be arbitrated.[5]

As pertinent here, the six Brokerage Service Agreements were each addressed to CFO Thomas and dated June 18, 2002; June 27, 2003; August 16, 2005; December 19, 2006; December 19, 2009; and May 1, 2011. The June 2002 Agreement was for one year and was signed on behalf of Berkeley Schools by a person named Angel Cartwright and

---

[4] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.

[5] As previously specified, Hub International purchased Knauff Insurance in 2012. Hub International thus invoked the Arbitration Clauses as Knauff Insurance's purported successor-in-interest.

on behalf of Knauff Insurance by Stanley Pokorney. The June 2003 Agreement was also for one year and was signed on behalf of Berkeley Schools by CFO Thomas and on behalf of Knauff Insurance by Stanley Pokorney. In contrast to the two earlier Agreements, the August 2005, December 2006, December 2009, and May 2011 Agreements were not signed, but generally purported to be between Berkeley Schools and Knauff Insurance for multi-year periods.

2.

a.

On March 19, 2018 — about two weeks after the Appellants moved to compel arbitration — Berkeley Schools substituted itself for the Berkeley County School Board of Trustees as the only plaintiff in these proceedings and filed an amended complaint. *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, No. 2:18-cv-00151 (D.S.C. Mar. 19, 2018), ECF No. 36 (the "Operative Complaint").[6] The Operative Complaint names as defendants the four Appellants, Knauff Insurance, and CFO Thomas.[7]

---

[6] Under South Carolina law, Berkeley Schools is ostensibly the proper named plaintiff and is entitled to pursue a lawsuit in its own name. *See* S.C. Code Ann. § 59-17-10 (providing that "[e]very school district is and shall be a body politic and corporate" and "may sue and be sued" in its own name).

[7] The parties and the district court apparently treated the Operative Complaint as properly filed "as a matter of course" pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure. The Operative Complaint was filed within 21 days of the Arbitration Motion, which was apparently considered to be "a responsive pleading," as contemplated by Rule 15(a)(1)(B). The Appellants did not seek to strike the Operative Complaint.

According to the Operative Complaint, Knauff Insurance and its employee, Stanley Pokorney, had provided insurance brokerage and consulting services to Berkeley Schools from 2001 to 2012. After acquiring Knauff Insurance in 2012, Hub International began providing insurance brokerage and consulting services to Berkeley Schools, and Stanley and Scott Pokorney — who became Hub International employees after it purchased Knauff Insurance — were closely involved in providing those services.

The Operative Complaint alleges, inter alia, that beginning in 2005 and continuing into 2017, Berkeley Schools CFO Thomas helped the Appellants and Knauff Insurance secure contracts to broker insurance policies for Berkeley Schools and to conduct reviews of the existing insurance policies of Berkeley Schools. In exchange for Thomas's assistance in steering those contracts to them, the Appellants and Knauff Insurance paid Thomas kickbacks "in the form of cash, expensive trips, hotel rooms, dinners, and spa services." *See* Operative Complaint ¶ 62. The Appellants and Knauff Insurance were the "insurance consultants" for Berkeley Schools, *id.* ¶ 238, and repeatedly breached their fiduciary duties by advising Berkeley Schools to purchase insurance that was unnecessary and excessive, and by charging Berkeley Schools "sham consulting fees for brokerage and insurance review," *id.* ¶ 213.

The Operative Complaint alleges that CFO Thomas, acting on Berkeley Schools' behalf, secured from the Appellants and Knauff Insurance a series of excessive and unnecessary insurance policies. Even though Thomas purportedly obtained those policies for Berkeley Schools, the Schools already had insurance coverage for most of the risks. For policies secured from the Appellants and Knauff Insurance that were not duplicative,

8

the Operative Complaint specifies that they were entirely unnecessary for other reasons, i.e., that Berkeley Schools had not historically purchased them, or that they were "highly unusual and prohibitively expensive." *See* Operative Complaint ¶ 96. Under the Operative Complaint, from 2005 to 2012, Berkeley Schools paid Knauff Insurance more than $3,300,000 in insurance premiums and approximately $1,600,000 in consulting and broker's fees. From 2012 through 2017, Berkeley Schools paid Hub International more than $3,400,000 in insurance premiums and about $1,500,000 in consulting and broker's fees.

According to the Operative Complaint, Berkeley Schools first learned on February 6, 2017, of the steering and kickback fraud scheme and conspiracy that the Appellants, Knauff Insurance, and CFO Thomas had orchestrated and executed. On that occasion, federal agents informed Berkeley Schools officials that CFO Thomas was the subject of a criminal investigation. In connection with that investigation, Thomas pleaded guilty in Charleston on January 16, 2018, to a twenty-count criminal Information filed on December 7, 2017, by the United States Attorney for the District of South Carolina. The Information charged Thomas with a single count of fraud and embezzlement from a federally funded program, nine counts of money laundering, and ten counts of honest services wire fraud.[8]

---

[8] On May 17, 2019, the district court entered judgment with respect to the Information, sentencing Thomas to 63 months in prison and ordering him to pay Berkeley Schools more than $1,000,000 in restitution. *See United States v. Thomas*, No. 2:17-cr-01150 (D.S.C. May 17, 2019), ECF No. 52 at 2, 5.

9

Pursuant to the Information, the ten honest services wire fraud offenses spanned the time period from March 2010 through November 2016. Those offenses related to Thomas receiving kickbacks from an insurance broker in exchange for steering insurance contracts to the broker. The Information further alleged that Thomas had used his CFO position with Berkeley Schools to steer the contracts to the broker, in that Thomas was responsible for procuring insurance policies on Berkeley Schools' behalf and for ensuring payments to its vendors. The Information identified ten checks received from the broker by Thomas between February 2013 and November 2016, and alleged that those checks represented wire fraud kickbacks. The Operative Complaint identifies the broker as appellant Stanley Pokorney.

In late 2017, while the federal investigation into Thomas's conduct was ongoing, he was indicted by a South Carolina grand jury in Columbia, in connection with the steering and kickback fraud scheme. The state Indictment charged Thomas with four embezzlement offenses, and Thomas pleaded guilty to all counts. Pertinent here, Thomas admitted to "deliberately causing [Berkeley Schools] to overpay a vendor, and then having the vendor send a refund of the overpayment to his home address, upon which the funds were converted to his personal use." *See* J.A. 209. The Operative Complaint alleges that the person who sent the refund to Thomas's home was appellant Stanley Pokorney, who was working for Knauff Insurance. That unlawful conduct occurred in November 2007.

Berkeley Schools attached to the Operative Complaint a total of twenty-three exhibits, including the federal Information, the state Indictment, and various emails that

10

carried out and implemented the scheming and conspiratorial dealings between the Appellants and Thomas. Berkeley Schools also attached thereto a spreadsheet specifying payments for brokerage services from Berkeley Schools to Knauff Insurance beginning in March 2005 and continuing through November 2012.

Predicated on the steering and kickback fraud scheme and conspiracy, the Operative Complaint alleges claims against the Appellants, Knauff Insurance, and Thomas for federal RICO violations, that is, civil violations of the Racketeer Influenced and Corrupt Organizations Act, plus state law claims for fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, negligence, conversion, constructive trust, and unjust enrichment. The Operative Complaint seeks statutory treble damages totalling more than $29,000,000, pursuant to 18 U.S.C. § 1964(c) (authorizing "threefold" damages to party injured by RICO violations).

b.

On March 19, 2018, the very day it filed the Operative Complaint, Berkeley Schools responded to the Arbitration Motion, denying that it had ever agreed to arbitrate any claims against the Appellants and Knauff Insurance. Berkeley Schools filed with its response the March 19, 2018 declaration of Marcia Abrahamson, Berkeley Schools' Director of Procurement and Contracting, confirming that there was nothing in the Berkeley Schools' records relating to or containing the unsigned Brokerage Service Agreements of August 2005, December 2006, December 2009, and May 2011. In addition, Abrahamson swore that "Thomas, in his position as Chief Financial Officer, did not have any authority to unilaterally contract for the procurement of insurance

11

consulting services . . . on behalf of [Berkeley Schools] during the period from 2005 through the present." *See* J.A. 125.

3.

On March 26, 2018, the Appellants filed a reply in further support of the Arbitration Motion, contending that the Operative Complaint was "part of a thinly-veiled attempt to gerrymander [Berkeley Schools'] case to avoid arbitration." *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, No. 2:18-cv-00151 (D.S.C. Mar. 26, 2018), ECF No. 38 at 1. The Appellants thus maintained that the Arbitration Clauses also mandated arbitration of Berkeley Schools' claims alleged in the Operative Complaint.

C.

1.

The district court conducted a non-evidentiary hearing on the Arbitration Motion in Charleston on May 17, 2018. During the hearing, Hub International's counsel maintained that the Arbitration Clauses require arbitration of Berkeley Schools' claims. He asserted that the Operative Complaint had changed the beginning date of the steering and kickback fraud scheme and conspiracy from 2001 to 2005 in order to "dodge" the June 2002 and June 2003 Brokerage Service Agreements, which were signed by Cartwright and Thomas, respectively, on Berkeley Schools' behalf. *See* J.A. 331. According to counsel, the June 2002 and June 2003 Agreements related to the Operative Complaint's claims, and Berkeley Schools had — at the very least — knowledge of those Agreements and the Arbitration Clauses. Counsel emphasized that Berkeley Schools had paid invoices submitted by Knauff Insurance for services provided pursuant to the four

12

unsigned Brokerage Service Agreements. He thus argued that Berkeley Schools had accepted those Agreements by performance and had consequently agreed to the Arbitration Clauses contained therein.

Berkeley Schools' lawyer orally responded that Berkeley Schools had never agreed to arbitrate any of its claims against the Appellants and Knauff Insurance. He represented to the court that Berkeley Schools never knew that the Brokerage Service Agreements (including the Arbitration Clauses) existed until receiving the Arbitration Motion on March 5, 2018. As for the June 2002 Agreement signed by Cartwright, Berkeley Schools' lawyer advised the court that she was simply CFO Thomas's "underling" at Berkeley Schools, and thus had no authority to bind Berkeley Schools. *See* J.A. 351. The lawyer stressed that the four Agreements purportedly formed within the timeframe alleged in the Operative Complaint were never signed by anyone or any party, and that Abrahamson could not locate any of them in the Berkeley Schools' records.

2.

On January 29, 2019, the district court entered its Denial Order. By that point in time, no answer had been filed by the Appellants to either the initial complaint or the Operative Complaint. And no discovery of any kind or type had been conducted. Thus, the court had before it only the Operative Complaint and its exhibits, the Arbitration Motion and its exhibits, Berkeley Schools' response to the Arbitration Motion and supporting exhibits, and the Appellants' reply thereto.

13

In assessing the Brokerage Service Agreements and the Arbitration Clauses, the Denial Order accepted the factual representations made by Berkeley Schools' lawyer that the Schools had no prior knowledge of the unsigned Agreements. And the court determined that the lawyer's representations were supported by the lack of signatures on those Agreements. The Denial Order ruled that Berkeley Schools "could not have agreed to the Brokerage Service Agreements if it did not know they existed," and therefore "there was no meeting of the minds where [Berkeley Schools] agreed to be bound by the Brokerage Services Agreements or the Arbitration Clauses." *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 363 F. Supp. 3d 632, 649 (D.S.C. 2019).

Insofar as the Appellants asserted that Berkeley Schools had accepted the unsigned Brokerage Service Agreements and the Arbitration Clauses by "paying the broker's and consultant's fees," the Denial Order concluded that the "usual rule" that a party can accept an offer by performance does not apply "to this most unusual set of facts." *See Berkeley Cty. Sch. Dist.*, 363 F. Supp. 3d at 649. Accepting the allegations of the Operative Complaint, the Denial Order determined that Thomas "caused [Berkeley Schools] to make the payments and perform the contract[s]," and that he "did so as part of a scheme to defraud [Berkeley Schools]." *Id.* For those reasons, the court was "unwilling to consider [Berkeley Schools'] payment of the broker's and consultant's fees as [Berkeley Schools'] acceptance of the Brokerage Service Agreements." *Id.* at 650.

Having resolved that Berkeley Schools had not assented to the unsigned Brokerage Service Agreements, the district court assessed the June 2002 Agreement signed by Cartwright. In that regard, the Denial Order accepted the factual representation

14

of Berkeley Schools' lawyer that Cartwright was Thomas's "underling," and doing his bidding. *See Berkeley Cty. Sch. Dist.*, 363 F. Supp. 3d at 650 & n.10. Based on the lawyer's representation, the court "impute[d] [Cartwright's] signature to Thomas," and rejected any notion that Cartwright had bound Berkeley Schools to the June 2002 Agreement. *Id.* at 650 n.10.

Finally, the district court considered whether Thomas had bound Berkeley Schools to any of the Brokerage Service Agreements and Arbitration Clauses. The Denial Order ruled that Thomas had not acted within "the scope of his employment" as the CFO for Berkeley Schools when he signed (or caused Cartwright to sign) the June 2002 and June 2003 Brokerage Service Agreements, and when "he caused [Berkeley Schools] to pay the fees [pursuant to the unsigned Agreements] to the [Appellants and Knauff Insurance]." *See Berkeley Cty. Sch. Dist.*, 363 F. Supp. 3d at 650. The Denial Order explained that, under South Carolina law, an employee's conduct falls outside the scope of his employment and "will not be imputed to his employer" when he "'acts for some independent purpose of his own, wholly disconnected from the furtherance of his employer's business.'" *Id.* (quoting *Vereen v. Liberty Life Ins. Co.*, 412 S.E.2d 425, 429 (S.C. Ct. App. 1991)). Because Thomas's actions were, the court found, "for the independent purpose of receiving kickbacks" and "actually harmed" Berkeley Schools, the court concluded that Thomas did not bind Berkeley Schools to the Brokerage Service Agreements and the Arbitration Clauses. *Id.* And because Berkeley Schools did not otherwise assent thereto, the Arbitration Motion was denied.

15

The Appellants noticed three separate appeals from the Denial Order, and those appeals have now been consolidated. We possess jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(B), which provides for interlocutory appellate review of an order denying a motion to compel arbitration.

## II.

We review de novo the district court's denial of the Arbitration Motion, which was pursued under 9 U.S.C. § 4. *See Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415 (4th Cir. 2019). In making that review, we accept as true the allegations of the Operative Complaint that relate to the "underlying dispute between the parties." *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (explaining that, in reviewing the denial of a § 4 motion, a court accepts as true the allegations in the "complaint that relate to the underlying dispute between the parties"); *Suburban Leisure Ctr., Inc. v. AMF Bowling Prods., Inc.*, 468 F.3d 523, 525 (8th Cir. 2006) (accepting allegations of complaint as true in reviewing court's denial of motion to compel arbitration).

Section 4 of Title 9 authorizes a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition [a] United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *See* 9 U.S.C. § 4. Section 4 provides that, when presented with such a petition (or motion), a court

16

shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

*Id.* On the other hand, § 4 further provides that if the "making of the arbitration agreement . . . be in issue," then "the court shall proceed summarily to the trial thereof." *Id.* (the "Trial Provision").

Section 4 thus requires that the district court — rather than an arbitrator — decide whether the parties have formed an agreement to arbitrate. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (explaining that dispute over formation of agreement to arbitrate "is generally for court[] to decide"); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002) (agreeing with other courts of appeals that party's assent to arbitration provision is question for court).[9]  In making such a decision, the court is obliged to conduct a trial under the Trial Provision when a party unequivocally denies "that an arbitration agreement exists," and "show[s] sufficient facts

---

[9] The Supreme Court has recognized "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability." *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted). Here, the Arbitration Clauses incorporate the Commercial Rules of the American Arbitration Association, which provide that an arbitrator has the power to rule on arbitrability issues. *See* Am. Arbitration Ass'n, *Commercial Arbitration Rules*, R-7(a) (amended Oct. 1, 2013). Such provisions requiring the arbitration of arbitrability questions do not, however, undermine § 4 of Title 9 and preclude a court from deciding that a party never made an agreement to arbitrate *any* issue (which would necessarily encompass an arbitrability issue). *See, e.g.*, 9 U.S.C. § 4; *Lloyd's Syndicate 457 v. FloaTEC, LLC*, 921 F.3d 508, 514 (5th Cir. 2019); *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019).

17

in support" thereof. *See Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015).

To decide whether "sufficient facts" support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test. *See Chorley Enters., Inc.*, 807 F.3d at 564; *see also* Fed. R. Civ. P. 56(a). In applying that standard, the court is entitled to consider materials other than the complaint and its supporting documents. *See Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 86 (4th Cir. 2016) (evaluating materials outside of complaint in assessing motion to compel arbitration). If the record reveals a genuine dispute of material fact "regarding the existence of an agreement to arbitrate," *see Chorley Enters., Inc.*, 807 F.3d at 564, the "court shall proceed summarily" and conduct a trial on the motion to compel arbitration, *see* 9 U.S.C. § 4. A factual dispute is material if the resolution thereof "might affect the outcome of the [motion] under the governing law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.

Here, the Appellants contend that the district court erred in denying the Arbitration Motion for two primary reasons. First, they maintain that the court misapprehended the applicable South Carolina legal principles in ruling that Thomas did not bind Berkeley Schools to the Brokerage Service Agreements and the Arbitration Clauses. Second, the Appellants contend that the court erred when it resolved disputed material factual issues

18

without a trial, in contravention of the Trial Provision.[10]  As explained below, although no party requested a trial on the Arbitration Motion, we are satisfied that the court was obliged to conduct one, in that genuine disputes of material fact exist regarding whether Berkeley Schools agreed to arbitrate the claims alleged in the Operative Complaint.

## A.

We begin with the contention of Berkeley Schools that we should decline to address whether the district court erred in not conducting a trial on the Arbitration Motion, in that the Appellants did not properly preserve the factual disputes issue in the district court.  Although Berkeley Schools is correct that we generally do not consider an issue raised for the first time on appeal, we possess the discretion to do so.  *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *United States v. Simms*, 914 F.3d 229, 238 n.4 (4th Cir. 2019) (en banc) (explaining discretion of court of appeals to review issue presented for first time on appeal); *Brickwood Contractors, Inc. v. Datanet*

---

[10] At oral argument of these appeals, Hub International's lawyer initially appeared to change his position on whether material factual disputes exist in relation to the Arbitration Motion.  That is — contrary to Hub International's appellate briefs — counsel asserted that there are no material factual disputes.  Counsel later returned to his initial position, however, maintaining that the district court should have conducted a trial on the Arbitration Motion and conceding that the parties do not agree on the relevant facts.  Despite the potential disconnect between the briefing and the oral argument representations, we are satisfied to address the issue as presented in the briefs.  *See Baker v. Corcoran*, 220 F.3d 276, 295 n.16 (4th Cir. 2000) (electing to address issue as raised in appellate brief where conflict existed between brief and oral argument).

*Eng'g, Inc.*, 369 F.3d 385, 396-97 (4th Cir. 2004) (en banc) (same). And we have exercised such discretion where, inter alia, a district court makes an error that is "plain," or where declining to decide the issue "would result in a fundamental miscarriage of justice." *See Dixon v. Edwards*, 290 F.3d 699, 719 (4th Cir. 2002); *see also Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 614 (4th Cir. 2002) (explaining that we may decide issue first raised on appeal under "exceptional circumstances").

Here, we will assess and resolve the factual disputes issue because the district court plainly erred in failing to conduct the proceedings mandated by the Trial Provision. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court *shall* proceed summarily to the trial thereof." (emphasis added)); *Brickwood Contractors, Inc.*, 369 F.3d at 399 (resolving challenge to imposition of sanctions presented for first time on appeal because lower court contravened mandatory language of Rule 11).[11] Moreover, none of the parties to these appeals will be prejudiced by this exercise of discretion. That is, the record is sufficiently developed on the question of whether the Trial Provision was contravened, and the parties have had a full opportunity to brief and argue it. *See Abril v. Virginia*, 145 F.3d 182, 185 n.4 (4th Cir. 1998) (emphasizing

---

[11] Put succinctly, the district court's error in failing to adhere to the Trial Provision is plain, and the failure to conduct a trial pursuant thereto impacted the substantial rights of the Appellants. *See In re Celotex Corp.*, 124 F.3d 619, 630-31 (4th Cir. 1997) (applying plain error standard in civil appeal). And, in these circumstances, our failure to recognize the error would seriously affect the fairness and integrity of the proceedings. *Id.*

20

"fairness" considerations when exercising discretion to address issue first presented on appeal).

B.

Exercising our discretion to review and resolve the factual disputes issue, we are satisfied that a remand is required by the Trial Provision of § 4. In explaining our ruling, we will begin with a summary of pertinent contract and agency law principles that relate to whether Berkeley Schools has agreed to the Brokerage Service Agreements and the Arbitration Clauses therein, and whether Thomas — as Berkeley Schools' agent — bound the Schools to those Agreements and Clauses. Applying those contract and agency law principles, we will then identify some material factual issues that the trial proceedings must resolve.

1.

Before identifying factual disputes on which a trial must be conducted, we will elucidate some state law principles that render those disputes material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "substantive law" identifies "which facts are material"). Because the issue of whether an arbitration agreement has been formed is an issue of contract law, we apply the "ordinary state-law principles that govern the formation of contracts" in reviewing a challenge under § 4. *See Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415 (4th Cir. 2019) (internal quotation marks omitted). In these appeals, Berkeley Schools and the Appellants agree that South Carolina law applies. *See*

21

*Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016) (applying state law agreed upon by parties in deciding arbitration issue).

Under South Carolina law, a contract is formed between two parties when there is, inter alia, "a mutual manifestation of assent to [its] terms." *See Edens v. Laurel Hill, Inc.*, 247 S.E.2d 434, 436 (S.C. 1978) (internal quotation marks omitted); *see also Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 762 S.E.2d 696, 701 (S.C. 2014) ("A valid and enforceable contract requires a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement."). Such mutual manifestation "ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party." *See* Restatement (Second) of Contracts § 22 (Am. Law Inst. 1981); *see also Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 166 (S.C. 2003) ("The necessary elements of a contract are an offer, acceptance, and valuable consideration."). And the manifestation of assent can be a return promise or performance. *See Sauner*, 581 S.E.2d at 165-66.

As the Denial Order recognized, an entity (such as Berkeley Schools) can be bound by an acceptance made by another (such as Thomas) of terms of an offer if there is an agency relationship between the two. *See Sampson & Wyatt v. Singer Mfg. Co.*, 5 S.C. 465, 467 (S.C. 1875) (explaining that agent can bind his principal if agent has authority to do so and "duly exercise[s] it"). In that situation, the entity is the "principal," and the person binding the entity is the principal's "agent." Put succinctly, "[a]n agent contracting *with the authority of his principal* binds him to the same extent as if the principal personally made the contract." *See S.C. Ins. Co. v. James C. Greene & Co.*, 348

22

S.E.2d 617, 624 (S.C. Ct. App. 1986) (emphasis added).[12]   And that proposition can encompass an agreement to arbitrate made between an agent (for example, Thomas) on behalf of his principal (Berkeley Schools), on the one hand, and a third party (the Appellants or Knauff Insurance), on the other.  *See Wilson v. Willis*, 827 S.E.2d 167, 174 (S.C. 2019).[13]

Whether the essential agency relationship actually exists, and the extent of the agent's authority, is a question of fact under South Carolina law.  *See Am. Fed. Bank, FSB v. Number One Main Joint Venture*, 467 S.E.2d 439, 442 (S.C. 1996) (existence of agency relationship is question of fact); *Hiott v. Guar. Nat'l Ins. Co.*, 496 S.E.2d 417, 421 (S.C. Ct. App. 1997) (extent of agent's authority is question of fact).  The necessary agency relationship can be proven "by evidence of actual [authority] or apparent authority."  *See R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 540 S.E.2d 113, 117 (S.C. Ct. App. 2000).

---

[12] A published decision of the intermediate court of appeals of South Carolina generally constitutes binding precedent, unless the decision conflicts with a decision from the high court of South Carolina.  *See State v. Ross*, 815 S.E.2d 754, 757 n.5 (S.C. 2018) (explaining that published opinion of South Carolina appellate court is binding precedent); S.C. App. Ct. R. 220(a) (explaining publication of appellate decisions); *see also* S.C. Const., art. V. § 9 ("The decisions of the Supreme Court shall bind the Court of Appeals as precedents.").

[13] South Carolina's highest court "has recognized several theories that could bind nonsignatories to arbitration agreements."  *See Wilson*, 827 S.E.2d at 174.  We focus on agency relationship concepts because they more likely resemble the parties' positions in these proceedings.

Under South Carolina law, "actual authority [must be] expressly conferred upon the agent by the principal." *See Richardson v. P.V., Inc.*, 682 S.E.2d 263, 265 (S.C. 2009). Apparent authority, on the other hand, can exist where "the principal knowingly permits the agent to exercise authority, or the principal holds the agent out as possessing such authority." *Id.* In other words, an apparent authority inquiry "focuses on the principal's manifestation to a third party that the agent has certain authority." *See Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 296 (S.C. 1996). Under the concept of apparent authority, the principal is "bound by the acts of its agent when it places the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe that the agent has certain authority and they in turn deal with the agent based upon that assumption." *Id.* When, however, a person dealing with an agent has notice of restrictions on the agent's authority and the agent contravenes those restrictions, or that person could not reasonably believe that the principal authorized the agent's conduct, the principal will not be bound by the agent's actions. *See id.*; *Vereen v. Liberty Life Ins. Co.*, 412 S.E.2d 425, 428-29 (S.C. Ct. App. 1991).

Important here — on the interplay of agency and contract principles — whether the agent possesses actual or apparent authority to bind his principal goes to the formation of a contract. *See Nat'l Fed. of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 81 (1st Cir. 2018) ("A challenge to formation can . . . be done by showing that one party never agreed to the terms of the contract, [or] that a signatory did not possess the authority to commit the principal . . . ." (citing *Buckeye Check Cashing, Inc. v.*

24

*Cardegna*, 546 U.S. 440, 444 n.1 (2006)); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (explaining that whether agent had authority to bind principal is contract formation issue); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (same). Accordingly, if the agent (for example, Thomas) lacks authority to bind his principal (Berkeley Schools) to a contract with a third party (the Appellants or Knauff Insurance) yet purports to do so anyway, no contract is formed between the principal and the third party. *See, e.g.*, *Nat'l Fed. of the Blind*, 904 F.3d at 81; *Sphere Drake Ins. Ltd.*, 256 F.3d at 591; *cf. Sauner*, 581 S.E.2d at 166 (emphasizing that offer and acceptance are "necessary elements" to form contract); *Edens*, 247 S.E.2d at 436 (explaining that mutual assent to terms is required to form contract). In sum, the existence of a contract is ultimately a question for a factfinder where "the evidence is either conflicting or admits of more than one inference." *See Small v. Springs Indus., Inc.*, 357 S.E.2d 452, 454 (S.C. 1987).

2.

Consistent with the South Carolina legal principles spelled out above, we are satisfied that there are genuine disputes of material fact that must be resolved in order to determine whether Berkeley Schools agreed to arbitrate its claims against the Appellants. To assist that endeavor, we will identify factual disputes concerning certain Brokerage Service Agreements and the Arbitration Clauses, including disputes regarding Berkeley Schools' knowledge of the unsigned Agreements, whether Thomas possessed actual authority to approve those Agreements for Berkeley Schools, and whether Thomas

25

possessed any apparent authority in that respect.[14] In so doing, we begin with the formation of the four Agreements that fall within the period of the alleged claims (that is, 2005 to 2017). We then turn to the June 2002 and June 2003 Agreements and their Arbitration Clauses, both of which predate the alleged conduct underlying the Operative Complaint.

a.

(1)

To start, there is a significant factual dispute regarding Berkeley Schools' knowledge of the Brokerage Service Agreements purportedly formed during the period encompassed by the Operative Complaint, i.e., the four unsigned Agreements. On the one hand, those Agreements are in the nature of fugitive documents and are not signed by Berkeley Schools or anyone else. *See Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854-55 (11th Cir. 1992) (concluding that dispute of fact existed where party denied existence of arbitration agreement and contract containing arbitration clause was unsigned), *abrogation on other grounds recognized by Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329-30 (11th Cir. 2016). And Abrahamson (Berkeley Schools' Director of Procurement and Contracting) has sworn that those Agreements

---

[14] We assess the Brokerage Service Agreements and the Arbitration Clauses together because, in these circumstances, the latter could not exist without the former. That is — although an arbitration clause is generally "severable from the contract in which it appears" — if the contract in which the arbitration clause "appears" was never formed, then the arbitration clause therein does not exist. *See Granite Rock Co.*, 561 U.S. at 299 (explaining severability principle and that such principle does not apply where party challenges formation of contract containing arbitration clause).

were not in the Berkeley Schools' files. *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 162 (3d Cir. 2009) (ruling that party's sworn assertion that she never received purported agreement containing arbitration clause created material dispute of fact).

On the other hand, the Appellants rely on the fact that Berkeley Schools made payments of large sums of money to Knauff Insurance for purported brokerage services from 2005 through 2012. A reasonable factfinder could thus infer Berkeley Schools' knowledge of, and acquiescence to, the Agreements, which contained provisions relating to brokerage services. A factual dispute therefore exists with respect to Berkeley Schools' knowledge of the unsigned Agreements. And that dispute is material in these proceedings because it concerns Berkeley Schools' acceptance of the Agreements and the Arbitration Clauses. *See Sauner*, 581 S.E.2d at 166 (emphasizing that acceptance of offer is necessary to form contract).

(2)

Next, there are readily identifiable factual disputes regarding Thomas's actual or apparent authority to assent — on Berkeley Schools' behalf — to the four unsigned Brokerage Service Agreements and their Arbitration Clauses. *See Hiott*, 496 S.E.2d at 421 (explaining that extent of agent's authority is question of fact). As to *actual* authority, Abrahamson explained in her declaration that

> Thomas, in his position as Chief Financial Officer, did not have any authority to unilaterally contract for the procurement of insurance consulting services . . . on behalf of [Berkeley Schools] during the period from 2005 through the present.

*See* J.A. 125; *see also Richardson*, 682 S.E.2d at 265 (explaining that "actual authority is expressly conferred upon the agent by the principal"); *Thompson v. Pruitt Corp.*, 784 S.E.2d 679, 686 (S.C. Ct. App. 2016) (agreeing with other courts that agent may not expand actual authority).

In contrast, the Information filed by the United States Attorney — to which Thomas pleaded guilty — specifies that, as Berkeley Schools' CFO, Thomas was "responsible for procuring and paying for [its] insurance policies." *See* J.A. 199; *see also Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir. 2005) (considering document attached to pleading as part thereof). Whether Thomas had actual authority to accept the Agreements and the Arbitration Clauses on behalf of Berkeley Schools is thus a disputed material fact, and that dispute relates directly to the formation of those Agreements. *See Nat'l Fed. of the Blind*, 904 F.3d at 81 (explaining that scope of agent's authority goes to formation of contract); *Sphere Drake Ins. Ltd.*, 256 F.3d at 591 (same); *Three Valleys Mun. Water Dist.*, 925 F.2d at 1140-41 (same).

There is also a factual dispute concerning Thomas's *apparent* authority to assent, on Berkeley Schools' behalf, to the four unsigned Brokerage Service Agreements and the Arbitration Clauses therein. In support of apparent authority, Berkeley Schools held Thomas out as its CFO. That fact might lead a reasonable person to believe that Berkeley Schools had granted Thomas ample authority to contract on its behalf. *See Rickborn*, 468 S.E.2d at 296 (explaining that a principal is "bound by the acts of its agent when it places the agent in such a position that persons of ordinary prudence . . . are led to believe that the agent has certain authority"); *WDI Meredith & Co. v. Am. Telesis, Inc.*, 597 S.E.2d

28

885, 887 (S.C. Ct. App. 2004) (relying, in part, on employee's "vice president" title in assessing apparent authority). And the payment of substantial brokerage fees to the Appellants and Knauff Insurance by Berkeley Schools could prompt a person of ordinary prudence to believe that Thomas had the authority to enter into the Agreements on the Schools' behalf.

On the other hand, however, a rational factfinder might well conclude that a reasonable person would not believe that Berkeley Schools had granted Thomas any authority to illegally steer contracts, like the Brokerage Service Agreements, to the Appellants and Knauff Insurance. *See Vereen*, 412 S.E.2d at 428-29 (emphasizing that principal is not bound by agent's conduct where third party could not reasonably believe that principal authorized agent's conduct). Indeed, the Operative Complaint and the federal Information, read together, convincingly show that Thomas illegally steered insurance contracts to the Appellants and Knauff Insurance. They also reveal that Thomas's acts of contract steering were ongoing in March 2010, shortly after the December 2009 Brokerage Service Agreement was purportedly formed (and while — according to its terms — it was in effect), and before the May 2011 Agreement was allegedly formed. A reasonable factfinder could also conclude that those Agreements resulted from actions to carry out the steering and kickback fraud scheme and conspiracy, and that the other unsigned Agreements (i.e., the August 2005 and December 2006 Agreements) also resulted therefrom. *See Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32-33 (2d Cir. 2001) (remanding for trial on motion to compel

29

arbitration where third party knew, or should have known, that agent had exceeded his authority by entering into contract containing arbitration clause).

Additionally, the Operative Complaint and state Indictment (to which Thomas also pleaded guilty) show that Thomas was actually involved in criminal conduct with the Appellants and Knauff Insurance over many years and as early as November 2007. That fact could readily undermine any understanding that Thomas possessed apparent authority to enter into the unsigned Agreements.

Turning to Berkeley Schools' payments of brokerage fees to the Appellants and Knauff Insurance, the record is unclear as to who approved those payments from Berkeley Schools. On this record, however, Thomas alone likely did so, as he oversaw payments to Berkeley Schools' vendors. And if Thomas arranged those payments as part of the kickback and fraud scheme and conspiracy with the Appellants and Knauff Insurance, a factfinder might well decline to attribute them to Berkeley Schools for apparent authority purposes. *See R & G Constr., Inc.*, 540 S.E.2d at 118 (explaining that focus of apparent authority inquiry is on principal's actions).

In sum, questions of material fact abound with respect to Thomas's actual or apparent authority to assent — on Berkeley Schools' behalf — to the fugitive documents that constitute the unsigned Brokerage Service Agreements and the Arbitration Clauses therein. *See Hiott*, 496 S.E.2d at 421 (explaining that extent of agent's authority is question of fact). Those factual questions concern the formation of the Agreements and the Arbitration Clauses, and can only be resolved by proceedings conducted pursuant to the Trial Provision. *See, e.g.*, *Nat'l Fed. of the Blind*, 904 F.3d at 81 ("A challenge to

30

formation can . . . be done by showing . . . that a signatory did not possess the authority to commit the principal . . . ."); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107 (3d Cir. 2000) (affirming denial of motion to compel arbitration pending trial on agent's authority to enter into arbitration agreement); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 55 (3d Cir. 1980) (remanding for trial to decide employee's authority to bind employer to arbitration agreement).

b.

Having identified some factual disputes concerning the formation of the four unsigned Brokerage Service Agreements and the Arbitration Clauses, we turn to the June 2002 and June 2003 Agreements. Those Agreements predate the steering and kickback fraud scheme and conspiracy alleged in the Operative Complaint. The Denial Order deemed the June 2002 and June 2003 Agreements as relevant because the initial complaint had predicated some of its claims on conduct dating from 2001. We have recognized, however, that an amended complaint — such as the Operative Complaint here — supersedes an initial complaint and renders it "of no effect." *See Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017) (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001)).

Moreover, because the June 2002 Agreement terminated in June 2003, and the June 2003 Agreement ended in June 2004, the Arbitration Clauses therein could not require Berkeley Schools to arbitrate any claims on the basis of conduct that began after those Agreements terminated. At best, the June 2002 and June 2003 Agreements might be relevant to questions of whether Berkeley Schools had knowledge of, or assented to,

31

the subsequent Brokerage Service Agreements and Arbitration Clauses. We leave such issues, however, for the remand proceedings.[15]

C.

At bottom, there are multiple disputes of material fact as to "the making of [any] arbitration agreement" between Berkeley Schools and the Appellants. *See* 9 U.S.C. § 4. The Trial Provision obliged the district court to conduct trial proceedings and thereby resolve those disputes before resolving the Arbitration Motion. *See id.* (requiring trial to be conducted where "the making of the arbitration agreement" is "in issue"); *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (explaining that appellate court is obliged to remand for trial when "factual issue exists regarding the formation of the arbitration agreement"); *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 713 (4th Cir. 2015) (emphasizing that district court must conduct trial on motion to compel arbitration where material factual dispute exists).

With respect to the type of trial proceedings that the district court might conduct on remand, we observe that § 4 provides as follows:

> If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may . . . on or before the return day of the

---

[15] In assessing the June 2002 Brokerage Service Agreement, the Denial Order determined that Cartwright (who signed that Agreement) could not bind Berkeley Schools because she was Thomas's "underling," and doing his bidding. *See Berkeley Cty. Sch. Dist.*, 363 F. Supp. 3d at 650 & n.10. That conclusion was predicated solely on the representation of Berkeley Schools' lawyer at the May 2018 hearing. We have explained, however, that the statements of a lawyer are not evidence. *See Couch v. Jabe*, 679 F.3d 197, 202 n.4 (4th Cir. 2012). Such reliance was therefore unwarranted.

notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury[.]

*See* 9 U.S.C. § 4. Section 4 thus authorizes the "party alleged to be in default" — that is, the party that failed to comply with an arbitration agreement — to request a jury trial "on or before the return day of the notice of application." *Id.*; *see also Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349 (11th Cir. 2017) (explaining that party that failed to comply with arbitration agreement is "party alleged to be in default").[16] In these circumstances, it appears that Berkeley Schools, as "the party alleged to be in default" of the Arbitration Clauses, could have demanded a jury trial on the Arbitration Motion. *See* 9 U.S.C. § 4. Berkeley Schools could also presumably have waived a jury and accepted a bench trial.

Finally, we recognize § 4's objective of encouraging the district courts to decide an arbitration dispute "quickly so the parties can get on with the merits of their dispute in the right forum." *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014). In that regard, the Trial Provision requires a court to "proceed summarily" to trial when there is a material factual dispute related to the making of an arbitration agreement. *See* 9 U.S.C. § 4; *see also Howard*, 748 F.3d at 978-79 ("Having found unresolved questions of material fact precluded it from deciding definitively whether the parties agreed to arbitrate, the district court was in no position to *deny* a motion to arbitrate. It

_____

[16] The "notice of application" in § 4 is apparently the notice of the filing of the motion to compel arbitration, and the "return day" therein is the date set for responding to such a motion. *See Burch*, 861 F.3d at 1349 n.19 (determining that the "return day of the notice of application" was when the party that received the motion to compel arbitration was required to respond).

33

*had* to move promptly to trial of the unresolved factual questions surrounding the parties' claimed agreement to arbitrate."). The courts of appeals may disagree somewhat on the procedures that a district court should employ before conducting the trial, and there is not a great deal of authority on that topic. *Compare Howard*, 748 F.3d at 984 ("[W]hen factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them isn't by round after round of discovery and motions practice."), *with Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (explaining that "limited discovery" and motions practice may be appropriate under § 4). In order to resolve these appeals, we do not delineate the pretrial procedures to which a court should adhere. Those procedures are reserved to the able lawyers for the parties and the sound discretion of our distinguished colleague on the district court.

## IV.

Pursuant to the foregoing, we vacate the Denial Order and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*